SMITH, Superintendent of Banks, et al, Respondent, v.
McCOWAN, Appellant.

(244 N. W. 891.)

(File No. 68·29.   Opinion filed November 1, 1932.)

*George W. Thwing,* of Timber Lake, and *A. A. Brown,* of Mobridge, for Appellant.

*Buell F. Jones,* Attorney General, *T. B. Thorson,* Assistant Attorney General, and *Morrison & Skaug,* of Mobridge, for Respondents.

CAMPBELL, P. J.   The First State Bank of Timber Lake closed at the end of the business day on Wednesday, May 13, 1925, and did not reopen the following morning, but went into the hands of the superintendent of banks for liquidation.   On Monday, May 11, the above-named defendant had on deposit in that bank subject to check $11,650.   Some time during the business day of Monday, the 11th, the bank transferred to the defendant out of its assets good interest-bearing promissory notes of third persons of the face value of $5,294, together with certain mortgages securing the same.   The only consideration paid by the defendant was his check drawn upon his account in the First State Bank of Timber Lake and subsequently debited to said account.   After taking possession of the bank for liquidation, it being demonstrated that the bank was insolvent on and prior to May 11, 1925, and that its assets were entirely insufficient to meet its liabilities, the superintendent of banks caused the present action to be instituted against the defendant for the return of such of the notes above mentioned as

defendant still had and for the recovery of such amounts as he had meantime collected thereon, upon the theory that the transfer of such assets to the defendant by the bank on May 11 constituted an unlawful preference. Findings, conclusions, and judgment were in favor of plaintiff, and from the judgment defendant has appealed, presenting the single question of the sufficiency of the findings to sustain the conclusions and judgment.

█ Since the decision of Adams & Westlake Co. v. Deyette, on rehearing in 1895 (8 S. D. 119, 65 N. W. 471, 31 L. R. A. 497, 59 Am. St. Rep. 751), this court has been committed to the so-called "trust fund doctrine," at least so far as the adoption of that doctrine may be deemed a prerequisite to a holding (in the absence of statutory regulation) that an insolvent corporation cannot prefer one of its creditors over another of the same class. See Furber v. Williams-Flower Co. (1907) 21 S. D. 228, 111 N. W. 548, 549, 8 L. R. A. (N. S.) 1259, 15 Ann. Cas. 1216; Lamro Bk. v. Bk. of Winner (1914) 34 S. D. 417, 148 N. W. 851; Bk. of Springfield v. Williams (1925) 48 S. D. 529, 205 N. W. 221; Farmers' Sav. Bk. v. Bergin (1927) 52 S. D. 1, 216 N. W. 597; on rehearing (1928) 53 S. D. 396, 220 N. W. 859; Woonsocket St. Bk. v. Parsons (1928) 52 S. D. 534, 219 N. W. 121; Blomquist v. Joint Stock Land Bk. (1928) 53 S. D. 414, 220 N. W. 876; Smith v. First Nat. Bk. of Madison (1929) 54 S. D. 427, 223 N. W. 341.

This "trust-fund doctrine," so far as concerns preferences, stated in its broadest and most general terms (see Furber v. Williams-Flower Co., supra), is "that insolvency converts the assets of a corporation into a trust fund for the equal benefit of creditors." Appellant urges in this case that the trust fund doctrine should not be applied to transactions in the ordinary course of business so long as the corporation (particularly in the case of a bank) is open and doing business as a going concern, and contends that the earliest stage of the proceedings when the doctrine should properly be availed of to prevent preferences is "when the bank closes its doors and then proceeds to single out and prefer certain of its depositors." The broad statements of our earlier decisions were couched unequivocally in the language of trust, and, without qualification or reservation, inferentially recognized the moment of insolvency of the corporation as the moment when the trust arose.

Neither this court nor any other, however, so far as we can ascertain, has ever been willing to concede the existence, as a matter of law, of all the consequences which would necessarily and logically result, if the so-called "trust" were an actual trust, and if it arose ex necessitate rei at the moment of corporate insolvency. This unwillingness to treat the situation in all respects and for all purposes as a true trust situation has driven the majority of courts to repudiate the trust fund doctrine entirely, and the minority who, like ourselves, have continued to adhere to it, while still using the language of trust upon insolvency, have more or less arbitrarily qualified and limited the application of the doctrine, and have quite generally held that the mere fact of insolventcy of the corporation, standing alone, was not enough to justify its invocation. The truth probably is, as pointed out in Pomeroy's Equity Jurisprudence (4th Ed.) § 1046, that we are dealing here with one of those situations "which are not, in any true and complete sense, trusts and can only be called so by way of analogy or metaphor," and that the language of trust is used merely as a strong mode of expressing the doctrine that an insolvent corporation, at least after a certain stage of its insolvency is reached, and as distinguished from an individual (see section 2039, R. C. 1919), cannot transfer its money or property to one creditor so as to prefer him over others in the same class. To that doctrine this court has been committed for some thirty-seven years; we do not think we ought to repudiate it now. It is probably not very material whether or not we continue, as we have previously done, to phrase the doctrine in the language of trust. Certainly it is harmless so to do if it be once understood that a true and complete trust, in every sense of the word and for all purposes, is not thereby intended. There remain then to consider the qualifications of and exceptions to the doctrine in its application, and its bearing upon the particular facts of the instant case.

This court has previously indicated that, if checks of a depositor were presented to an insolvent bank for payment in good faith, and were in fact paid by it, other creditors could not have the payment restored as preferential upon subsequent closing of the bank, if the persons presenting the check for payment were not aware of the insolvency of the payee bank. Wingfield v. Sec. Nat. Bk. (1917) 38 S. D. 491, 162 N. W. 309. We held in Blom-

quist v. Joint Stock Land Bk., supra (1928) 53 S. D. 414, 220 N. W, 876, that the mere fact that an insolvent corporation was still "a going concern" did not permit it to prefer its creditors. In the case of banks particularly, however, there is a fair inference from the language of the opinion in Farmers' Sav. Bk. v. Bergin, supra (1927) 52 S. D. 1, 216 N. W. 597, and Woonsocket St. Bk. v. Parsons, supra (1928) 52 S. D. 534, 219 N. W. 121, that, if the bank is still open and doing business as a going concern, and the particular transaction is in good faith and due and regular course of ordinary business, it will not necessarily be deemed preferential, notwithstanding the fact that the bank at the time is actually insolvent. If we once depart, as we have departed by inference at least, from the view that the mere insolvency of any corporation standing alone is enough to render all subsequent payments or transfers to creditors preferential, then we must endeavor to establish as nearly as may be some other line of division between preferential and nonpreferential dealings with creditors. This is of particular importance to the general public in the case of insolvent banks because of the fact, so well known as to be a proper subject for judicial notice, that almost every closed bank has kept its doors open, dealt with its customers, and transacted business ostensibly as usual, for a greater or lesser period of time after actual insolvency. There is usually an appreciable interval after actual, technical bank insolvency when there is still hope and reasonable possibility of being able to surmount immediate difficulties, repair the insolvency, and continue in business indefinitely. Manifestly every bank customer who cashes a check over the counter during that interval should not be required to refund the money merely because those hopes are disappointed, the insolvency continues, and the bank presently closes. Equally, on the other hand, it should not be possible for the officers of the bank, merely by continuing to keep its doors open, to dispose of all its good assets to a favored few of its creditors.

Each case will necessarily depend to a considerable extent upon its own particular facts, but we think applicable general principles may be summarized about as follows: In every bank failure there comes a time after actual insolvency and prior to closing when it is apparent that the insolvency is hopeless and that there is no longer any reasonable expectation of being able to redeem the

bank's fortunes and continue in business. At or before that stage of the insolvency is reached, the bank ought to be closed, but this is not always done. Just when that stage is reached with reference to any particular bank is a question of fact. Prior to that stage of the proceedings, transfers or payments by the bank to a creditor will not be deemed preferential, unless made in actual contemplation of insolvency or with actual intention to creat a preference, which will usually mean (although perhaps not always or necessarily) that the particular creditor with whom the dealing is had knows, or has reason to know, of the insolvent and failing condition of the bank. When the stage of insolvency is reached, however, where there is no longer a reasonable expectation of recovery, the necessary result of any transfer of assets or payment to a creditor will be to create a preference. From that point forward the officers of the bank must be deemed, as a matter of law, to be dealing with the assets of the bank in contemplation of insolvency, and must be deemed, as a matter of law, to intend a preference if they transfer or pay any of such assets to a creditor without other consideration than a cancellation pro tanto of that creditor's claim against the bank. All such payments and transfers will be deemed preferential and recoverable accordingly, excepting only those which are clearly found, as a matter of fact, to be made in the due, ordinary, usual, and customary course of the banking business to a creditor without knowledge of the true situation and not motivated by a desire to secure a preference.'

██ ██ Appellant urges that the transaction involved in the instant case was a nonpreferential transaction in the due and ordinary course of business, and we must therefore consider somewhat more in detail the relevant facts here presented. The appeal being from the judgment only, the validity of the findings is not questioned, and they indicate a situation about as follows: The First State Bank of Timber Lake closed at the end of the business day on Wednesday, May 13, 1925, and did not reopen. It was hopelessly insolvent, and had been for some time, as its officers well knew. Its cash on hand and in banks at the time of closing was $5,888. At the end of the preceding business days of Tuesday, Monday, and Saturday, respectively, its total cash on hand and in banks was $6,856.54, $7,006.55, and $8,401.09. Appellant had been a customer of this bank for many years. May 8, 1924, the

bank issued to him for value two certificates of deposit bearing interest at the rate of 5 per cent and maturing six months after date. At the maturity of said certificates he brought them to the bank, and it was agreed between appellant and the officers of the bank that the bank would continue to pay 5 per cent interest on the face of the certificates, and that he might cash them at such future time as he desired, receiving 5 per cent interest from the date of issue to the time he cashed them. On the 7th of May, 1925, appellant had on deposit in his checking account in the bank $4,650.87. The next day appellant took into the bank his two certificates of deposit, and asked to have the amount thereof, with accrued interest ($10,500), credited to his checking account. This was accordingly done, and each of the certificates of deposit was surrendered and stamped "Paid." On that day the reserve of the bank was only 3½ per cent, and its total cash in its own vault and in other banks to its credit was only $9,867.92, and appellant was a creditor of the bank upon open checking account in the sum of $15,150.87. On Saturday, May 9th, appellant loaned $500 to an individual, giving the borrower his check on the bank. On Monday, May 11th, appellant loaned the further sum of $3,000 to two other persons, giving them likewise his checks on the bank. The total cash on hand and in other banks at the close of business on Saturday, May 9th, was $8,401.09. On Monday, May 11th, there were presented to the bank for payment and paid by it the checks issued by appellant in connection with the three loans he had made on Saturday and Monday in the aggregate amount of $3,500, being practically 50 per cent of the bank's total cash in its own vaults and in other banks, and leaving appellant with a checking account balance of $11,650.87. Some time during the business day of Monday, May 11th, and after the cashing of the checks of appellant aggregating $3,500, the president of the bank stated to appellant that he observed appellant was making loans and proposed to sell to appellant certain notes owned by the bank with mortgages securing the same. Appellant evinced a willingness to purchase the notes, and during the business day on Monday the bank transferred to appellant five promissory notes owned by it, together with mortgages securing the same, of the aggregate amount (principal and accrued interest) of $5,294.81. Appellant delivered to the bank his checks upon his account therein in that

amount, and his account was debited accordingly. The bank for many years, according to the findings of the court, "had made a part of its banking business the sale of notes and other assets belonging to it," and the appellant "for about forty years had made loaning money a part of his business." The court further finds that appellant at the time of the transaction did not know, or have reason to know, of the insolvency of the bank, and that he purchased the notes in question during bank hours and in good faith while the bank was a going concern.

So far as appellant is concerned, it must be said upon these findings that he was not guilty of any fraud, nor did he participate in any conspiracy to secure a preference. So far as the bank officers are concerned, it must be said, under the circumstances here appearing, that the bank on Monday, May 11th, was hopelessly insolvent beyond the possibility of any reasonable expectation of redeeming its fortunes, and the bank officers knew it. So far as the bank officers are concerned, it must be said, as a matter of law, that they dealt with the assets of the bank on that day in contemplation of insolvency and not otherwise, and that when on that day they made any payment or transfer of assets to a creditor of the bank without consideration other than the pre-existing debt, they must be held to have known, as a matter of law, that a preference would necessarily result. The question then arises whether the transaction was the payment of a creditor's demand in the ordinary course of business such that it should be held nonpreferential, in view of the good faith of the appellant and in spite of the fact of the hopeless insolvency of the bank, and in spite of the fact that the bank officers were acting, in the eyes of the law, in contemplation of insolvency and with knowledge that the transaction would necessarily result in a preference. The trial court has held the transfer preferential, and we do not believe on this record we can find otherwise. Conceding that this bank has been accustomed to sell notes and other assets belonging to it, and that appellant has been in the business of loaning money, and may frequently have purchased notes and mortgages from the bank, nevertheless we do not think such a transaction is the payment of a creditor's demand in the ordinary course of business in the sense that such phrase is employed in stating an exception to the rule that payments or transfers in contemplation of insolvency and which neces-

sarily result in preferring one creditor to another are recoverable as preferential. The ordinary method whereby a bank satisfies demands of deposit creditors against it is by payment in cash or current exchange. While it may be neither irregular nor improper under usual conditions for a bank to meet the demands of a depositor by turning over notes from its pouch, nevertheless that is not the ordinary course of the banking business. It is not the method by which the depositor with an open checking account is ordinarily or customarily paid. The exception relating to payment of a creditor in usual and ordinary course of business, when all reasonable possibility of redeeming the bank's fortunes has passed, notwithstanding its doors are still open, must be limited in its meaning, we think, to the payment of depositor's demands in cash or current exchange. To hold otherwise would open wide the door to a series of preferences that could hardly be established or recovered. There is not much likelihood, when a bank is in failing circumstances, that its officers will go to large depositors and say, "You had better withdraw your money from our bank." If that were done, the very fact of so doing would put the depositors upon notice as to the condition of the bank. But it would be very possible for bank officers during a brief period before closing for liquidation to go to favored depositors and say, in substance, as was said in this case, "I see you have quite a bit of money in your checking account. Wouldn't you like to buy some notes?" and in that manner transfer every good note in the bank to one of a favored few, thus greatly depleting the good assets of the bank at the expense of all other creditors.

We are not prepared to say that the learned trial court erred in this case upon the facts here appearing from the findings in holding the transfer in question preferential and recoverable, and the judgment appealed from is therefore affirmed.

POLLEY and ROBERTS, JJ., concur.

WARREN and RUDOLPH, JJ., deeming themselves disqualified, not sitting.