CARGILL, INCORPORATED, a
Delaware Corporation

v.

AMERICAN PORK PRODUCERS, INC.,
an Iowa Corporation, et al.

No. CIV 74–5057.

United States District Court,
D. South Dakota.

Feb. 8, 1977.

500

Edward C. Carpenter, Rapid City, S. D., for plaintiff.

Ronald Banks, Fred Hendrickson, Rapid City, S. D., George T. Qualley, Sioux City, Iowa, Gene Lebrun, Rapid City, S. D., for defendants.

## MEMORANDUM OPINION

BOGUE, District Judge:

The above-entitled matter came on for trial before the Court, without a jury, on June 14th through 17th, 1976. Cross claims had been severed for separate trial pursuant to stipulation by counsel. All parties produced their evidence and thereupon rested. The Court took the matter under advisement pending receipt of proposed findings of fact and conclusions of law. Having examined the transcript and the exhibits, as well as proposed findings and conclusions, and being fully advised, this Court makes and adopts the findings of fact and conclusions of law hereinafter set forth.

### I.

### JURISDICTION

The Court finds, pursuant to stipulation by counsel, that Plaintiff Cargill, Inc. (hereinafter Cargill) is a Delaware corporation with its principal place of business in Minnesota; that Defendant, American Pork Producers, Inc., (hereinafter American Pork), is an Iowa corporation with its principal place of business in the State of South Dakota; that the Defendants, Al Cochran, Don Emmick, Emery Vlotho and Frank Seitzinger are each and all citizens of the State of Iowa; that the Defendant Jerry Feurhelm, is a citizen of Nebraska; and that the Defendant, Robert Seegers, is a citizen of the State of Illinois.

The amount in controversy, exclusive of interest and costs, exceeds the sum of Ten Thousand Dollars ($10,000); moreover, each and all of the Defendants have been validly served with process in the above-entitled action.

Accordingly, this Court has personal jurisdiction over the parties and subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

### II.

### GENERAL FINDINGS

Beginning in 1972, and at all times pertinent for this case, American Pork, as a foreign corporation, engaged in the business of buying, breeding, feeding, raising and selling pigs at a site known as Igloo in southwestern South Dakota. The basic plan of operations was to raise capital by selling "hog units" to investors who would be induced to buy the units as a tax shelter. American Pork would make money by providing labor, management, feed, water, housing and veterinarian services for the investors' hogs.

At all times pertinent for this lawsuit the individual Defendants were directors of American Pork. The officers of the corporation were as follows:

(1) President—Emery Vlotho;

(2) Vice-president—Jerry Feurhelm;

(3) Secretary—Robert Seegers; and

(4) Treasurer—Frank Seitzinger.

The books for the corporation were kept by Jolliffe Tax Service,[1] an accounting firm with its main office in Laurens, Iowa. The manager of the American Pork plant at Igloo was one David Jensen.

The pork enterprise had problems. American Pork had first qualified to do business in South Dakota as a foreign corporation on May 17, 1972. On September 1, 1973, its certificate of authority was revoked for failure to file the 1972 annual

---

1. Later changed to "Jolliffe & Company."

report.[2] The corporation again qualified to do business in South Dakota on January 17, 1975.

In June, 1972 the Securities Exchange Commission entered a cease and desist order prohibiting further sale of investor units, *i. e.* hog units, until the program was registered with the S.E.C. This registration was not accomplished at any time prior to the trial of this case.

The main problem in late 1973 was a shortage of cash. The corporation was initially capitalized in the amount of One Hundred Thousand Dollars ($100,000.00), half of which was cash. By December 30, 1973, this had been increased to Two Hundred Three Thousand Dollars ($203,000.00). Some (perhaps all) of the increase came from contributions by directors of the corporation who put in cash in exchange for stock during the fall of 1973 when past-due payables were accumulating and cash was short.

Despite the fact that in August of 1973 a loan of Two Hundred Twenty Three Thousand Dollars ($223,000.00) had been arranged with Bank and Trust Company of Des Moines, Iowa, more cash was needed by October in order to meet current liabilities. At a meeting of the Board of Directors on October 18, 1973, Helen Jolliffe, who kept the corporation's books, projected minus cash flow figures for the next several months. The Directors recognized that to operate the business additional financing would be needed. For several months following the October 18, 1973, meeting Mr. Vlotho, Mrs. Jolliffe and others worked to create loan proposals and to present them to potential lenders. Efforts to secure additional financing were not successful, however, at least within any time period relevant for this lawsuit.

Meanwhile, the hogs needed feed. From July, 1972 until February of 1974, feed was purchased by American Pork from Edgemont Feeders, a partnership in which Jerry Fuerhelm was one-third owner. On or about February 14, 1974, American Pork began purchasing feed on credit from Cargill and continued such purchases until May 28, 1976. As of May 28, 1976, after deducting an April payment of $26,600.00, there remained due and owing on the Cargill account an amount exceeding Ninety Five Thousand Dollars ($95,000.00). The corporation did not pay the account and the present lawsuit began.

On February 21, 1975, this Court entered a default judgment for Cargill and against American Pork Producers, Inc. in the sum of One Hundred Five Thousand, Two Hundred Forty Dollars and Five Cents ($105,-240.05) plus the statutory interest rate of eight percent (8%) per annum from the date of judgment until ·date of payment. The sum awarded included court costs and, of course, included interest added to the account by Cargill due to the account's delinquency. The default judgment has not been paid as the corporation does not have assets sufficient to satisfy the judgment.

### III.

### THEORIES OF RECOVERY

The case against the individual defendants went to trial because numerous factual issues were disputed and the resolution of the same was a prerequisite for any further legal rulings. Plaintiff has three separate legal theories upon which, it is urged, personal liability should be imposed on one or more directors for all or part of the debt. First, Plaintiff contends that credit was extended in reliance upon fraudulent representations of American Pork's financial condition, and that the directors ought to be jointly and severally liable for said representations. Second, Plaintiff contends certain preferential payments were made to directors when American Pork was unable to meet its current liabilities, and the recipients of said payments are liable now to Cargill for the amount of such payments. Third, it is contended that one or more

---

**2.** Plaintiff's first theory of liability of the individual defendants rested upon this revocation. In an earlier memorandum opinion, this Court set out the reasons for denying liability on this basis as a matter of law. 415 F.Supp. 876.

directors personally guaranteed payment on the Cargill account and, consequently, should be held personally liable.

For the sake of clarity and order the Court will make special findings and legal conclusions according to a three-point plan. With reference to each theory, *supra*, the Court will do the following: (1) set out the elements that must be proved by a preponderance if Plaintiff is to recover on that particular theory; (2) make special findings of fact relating to each element; and (3) make legal conclusions as to the sufficiency of the evidence to establish one or more elements required by each theory of recovery.

## IV.

### FIRST THEORY OF RECOVERY— MISREPRESENTATION OF FINANCIAL CONDITION

In order to recover from one or more directors on the theory of fraudulent misrepresentation of financial condition, Cargill is required to prove by a preponderance each of the following elements:[3] (1) that a false representation of a material fact was made by one or more of the Defendants; (2) that the person(s) making the representation knew the fact was not true or made the statement recklessly with no reasonable grounds for believing it to be true; (3) that the misrepresentation was made with the intent to induce the Plaintiff to act upon it; (4) that the Plaintiff took action or refrained from acting in reliance upon the misrepresentation; and (5) that the Plaintiff incurred damage from such reliance.

There is no legal magic in the number of elements listed; some commentators and judges may list six or seven by more narrowly dissecting the legal concepts. Moreover, there is a danger of over-simplification in producing a five-point formula for liability, for each element has a long line of case law behind it, and the meaning of each element tends to change to fit the infinite variety of the commercial world. Nonetheless, we think this statement of the law sets out the basic principles with reference to which special findings must be made.

With reference to the first question, *i.e.* whether or not a false statement of fact was made, the Court finds: the first credit sale from Cargill to American Pork was made on February 14, 1974. (Ex. 1). This first credit sale was negotiated by Walter Brigger, district manager for Cargill stationed in Lennox, South Dakota, and by Helen Jolliffe, the accountant who kept books for American Pork. (Tr. 115, 116). Mr. Brigger knew he was dealing with a corporation (Tr. 115, 116).

Additional sales of feed were made on credit to American Pork by Cargill on February 15, 1974, February 20, 1974 and twice

---

**3.** In this suit the Court is obliged to articulate and apply state law concerning the liabilities of corporate officers and directors. In regard to Plaintiff's first theory, there is no statute directly on point and only a dearth of relevant case law. The Court concludes that the law of liability for fraudulent misrepresentations by officers or directors is correctly stated in the five elements enumerated for the following reasons: (1) In the case of *Viajes Iberia v. Dougherty*, 87 S.D. 591, 212 N.W.2d 656 (1973), the South Dakota Supreme Court considered the question of finding fraudulent misrepresentation of corporate financial condition (by a corporation president) and directed us to 37 Am. Jur.2d, *Fraud and Deceit*, § 223 for the applicable principles. The Am.Jur. reference explains principles of misrepresentation generally; we conclude that the Court found these principles applicable to corporate officers and directors in South Dakota. (2) S.D.C.L. § 47–5–15 through § 47–5–19, adopted from the Model Business Act, set stringent standards of responsibility for officers and directors and imposes civil liability for violation of these standards. Each section begins with the words: "In addition to other liabilities imposed by law . . ." and then follows a specific imposition of liability. The legislature intended that civil liability could be imposed under other laws. (3) S.D.C.L. § 20–10–1 through § 20–10–3 codifies the common law action of deceit. Its application is apparently at least as broad as common law deceit which has applied to corporate officers and directors since *Perry v. Peek*, 14 (1889), 14 A.C. 337. (4) Treatises on the present question reflect the fact that the law in this area is well established in most jurisdictions and there appears to be no trend to allow fraudulent representations to be made by corporate officers without liability being imposed. *See*, 3 A. Fletcher, Cyclopedia Corporations, § 1146 (1975); 19 Am.Jur.2d, *Corporations*, § 1385; 32 A.L.R.2d 227, § 24 and the cases cited therein.

on February 22, 1974 without further significant contacts between American Pork and Cargill (Tr. 20, 21, Ex. 1). From February 14 to February 23, 1974, no director or officer of American Pork made any statement(s) of significance to any Cargill representatives concerning the financial condition of American Pork.

On February 23, 1974, Emery Vlotho, president of American Pork met with Robert Mason, assistant vice-president of Cargill, in a hotel coffee shop in Minneapolis, Minnesota, and discussed the possibility of further feed sales to American Pork (Tr. 7–10, 18). At this meeting Emery Vlotho stated to Bob Mason that the net worth of the American Pork Corporation was about or in excess of One Hundred Thousand Dollars ($100,000.00) (Tr. 9, 171). At the same meeting on February 23, Emery Vlotho made statements to Bob Mason which statements conveyed the impression that Cargill would be timely paid for feed shipped on the basis of a thirty-day extension of credit (Tr. 35, 171).

The representation of net worth without qualification and the representation that Cargill would be timely paid for feed shipped on a credit basis were representations which would normally be understood to mean that American Pork was solvent both in the sense that assets exceeded liabilities and in the sense that American Pork could meet current liabilities as they became due. On February 23 American Pork *may* have been solvent in the sense that assets exceeded liabilities, but was not solvent in the equity sense; *i.e.* ability to pay current liabilities (Tr. 240–258).

Timely payment of the feed bill being accrued was contingent on financing (Tr. 269). No loan had been arranged as of February 23 (Tr. 257–259). Emery Vlotho and Helen Jolliffe met with a brokerage firm in Minneapolis on February 23 at a time subsequent to the meeting with Mason (Tr. 310–311). The purpose of the meeting was to try to obtain private placement money (Tr. 310–311). The S.E.C. cease and desist order on sale of investor units had not been lifted (Tr. 341). As of February

23, 1974, there was no reasonable certainty that investor units would be or could be sold, and there was no reasonably certain arrangement to obtain loan money.

■ The statements of Emery Vlotho to Bob Mason on February 23 were false representations of the financial condition of American Pork as of February 23. It is not necessary to find that Vlotho's statements were literally false; misrepresentation may be found in statements which are literally true but which naturally tend to create a false impression in the mind of the hearer. PROSSER, LAW OF TORTS, § 1–6 (4th Ed. 1971). Taken in context, considering both what Vlotho said and what he failed to say, the impression naturally conveyed was misrepresentation of the present financial condition of American Pork.

Between the February 23 meeting and the last feed shipment on May 28, 1974, contact between Vlotho and Mason consisted of telephone conversations (Tr. 14–17). The substance of the conversations related to an insufficient funds check, Cargill's concern for the account, and personal guarantees on checks (Tr. 14–17). During these conversations Vlotho's only representation concerning American Pork's financial condition was the assurance that financing would soon be obtained (Tr. 16).

On or about March 15, 1974, Cargill received a financial statement (Ex. 7) from the Jolliffe Tax Service (Tr. 28–29). This report was prepared by Mrs. Jolliffe for the management of American Pork, it was prepared according to sound accounting principles (Tr. 369, 370) but it was of minimal use to creditors as it was prepared primarily for tax purposes (Tr. 292, 293).

No director or officer of American Pork influenced the making of the financial statement (Tr. 293, 369–370). It was mailed pursuant to a request by Cargill and not at the direction of any officer or director of American Pork (Tr. 260, 261). At a later date, but prior to May 28, Cargill also received an audited financial statement (Ex. 21) prepared by Wohlenberg Gage & Co. of Sioux Falls, South Dakota (Tr. 87). Neither financial statement constitutes a represen-

tation made by an officer or director of American Pork to Cargill for the reason that Mrs. Jolliffe was an independent contractor and was at no time an employee or officer of American Pork.

On April 18, 1974, the new district manager at Lennox, Don Ketcham, wrote a letter to Emery Vlotho placing American Pork on a cash basis (Tr. 129). Subsequently, Mr. Ketcham had one or more telephone conversations with Mr. Vlotho the substance of which related to personal guarantees (Tr. 130–131). At this point the Court makes no finding that a misrepresentation of financial condition of American Pork was made in the Vlotho-Ketcham contacts which occurred during this period of time. (These contacts and their significance will be discussed in detail in part VI of this opinion.)

One other contact is of interest. On April 20 Mrs. Jolliffe met with Mr. Mason, again in Minneapolis (Tr. 11, 12). She tried to interest Cargill in investing in or loaning money to American Pork (Tr. 12, 268–269, 350–351). Mason indicated Cargill would not be interested (Tr. 351). We find that no false representations were made by Mrs. Jolliffe at that meeting; in any event, she carried no representations of any officers or directors concerning the financial status of American Pork.

Having examined the record in some detail in an effort to pinpoint any and all representations made by directors or officers of American Pork as to financial condition, the Court finds that the *only* false representation made by either an officer or director was the February 23rd statement of Emery Vlotho to Bob Mason. This finding has an important consequence; namely, all other elements necessary to a finding of liability under Plaintiff's first theory of recovery must be found in relation to the representation made on February 23.

With reference to the question of whether or not the false representation was made knowingly or without reasonable grounds for believing it to be true; the Court finds: Emery Vlotho knew that the S.E.C. order prohibiting sales of investor units was still in force. This is the only reasonable inference we can draw from the testimony of the lawyer who handled the S.E.C. work (Tr. 341). Sale of investor units without S.E.C. registration was unlawful. On February 23 when Mr. Vlotho met with Bob Mason, Mr. Vlotho knew that American Pork did not have a cash flow sufficient to meet current liabilities. This is a necessary inference based on all of Mrs. Jolliffe's testimony relating to cash flow. Mr. Vlotho also knew that no loan had been negotiated to meet American Pork's current cash requirements (Tr. 310–312). In view of these facts, the Court further finds that any statement representing the corporation as able to pay for feed shipped on a thirty-day credit basis was recklessly made without reasonable grounds for belief in the truth thereof.

With reference to the question of whether or not a misrepresentation was made to induce Cargill to act, the Court finds: representations about American Pork's financial condition had no purpose other than to induce action; specifically the sale of feed on credit.

With reference to the question of whether or not credit was extended in reliance upon Mr. Vlotho's statements to Bob Mason at the February 23 meeting; the Court finds: Cargill extended the initial $15,803.00 in credit to American Pork before making any contact with Mr. Vlotho or any other directors (Tr. 20, 21). (This amount is the sum of the charges made on February 14, 15, 20 and 22 of 1974.) This extension of credit could not have been made in reliance upon Mr. Vlotho's representations because it preceded the February 23 meeting in Minneapolis.

Subsequent to the February 23 meeting Cargill made an independent credit investigation. Walt Brigger, the district manager at Lennox, South Dakota, telephoned the Des Moines Bank and Trust, the financial institution with which American Pork did business (Ex. 3) (Tr. 30). Cargill obtained a Dunn and Bradstreet Report by March 7, 1974 (Tr. 32, 78, 79). In-house inquiries

were made, *e.g.* a check was made with a Cargill salesman in Le Mars, Iowa, (Tr. 47–48, 55). On or about March 17, the Lennox office received the unaudited financial statement from Mrs. Jolliffe (Tr. 28, 29). Some time thereafter the audited statement was received. In consideration of these preliminary findings, the Court further finds that Cargill did *not* in fact extend credit to American Pork in reliance upon Mr. Vlotho's representations as to financial condition.

The element of reliance forms the causal link between misrepresentation and detriment; *i.e.* for liability to lie, the false statement must be a substantial cause of the damage suffered. Prosser, Law of Torts, § 108 (4th Ed. 1971). It need not be the only cause, but the evidence must show by a preponderance that the damage incurred was incurred by reliance upon the particular misrepresentation made, and conversely, that the misrepresentation was a substantial cause of the damage incurred.[4] Assertions that action was taken in reliance upon a particular representation must be studied with an eye to the context in which reliance allegedly was present.

Mr. Mason, of course, stated that he relied at least in part upon Vlotho's statements (Tr. 102). Yet, Mr. Mason himself stated that the conversation in which he heard the representations was devoted almost exclusively to his *selling* feed to American Pork and understanding the American Pork enterprise (Tr. 7, 8, 21, 22). Thus, the statements made by Mr. Vlotho were at the end of a conference devoted largely to Cargill's efforts to sell itself to American Pork and not vice versa.

After hearing Mr. Vlotho's statement, Mr. Mason proceeded to launch a credit investigation. As stated, *supra,* Cargill received a Dunn and Bradstreet rating, two financial reports, and other information all of which appeared to Cargill's representatives to be justification for further extension of credit.

Viewing this course of events as an integrated whole, this Court finds that credit was extended prior to the Vlotho-Mason conference; an independent investigation was made in conjunction with the credit extension; moreover, the credit extensions continued beyond a point in time at which Cargill's representatives knew for certain that American Pork was not meeting current liabilities. It appears probable that credit would have been extended even if the Minneapolis meeting had never occurred. Hence, it has not been proved to this Court by a preponderance of the evidence that *any* credit extension was made because of *substantial* reliance upon Vlotho's statements as of February 23.[5]

This Court concludes, therefore, that no recovery can be had on the first theory advanced by Plaintiff.

4. Reliance has long been recognized in South Dakota case law as a necessary element in cases resting on the theory of fraudulent misrepresentation. *First National Bank v. Kendall, et al.,* 6 S.D. 543, 62 N.W. 377 (1895); *Viajes Iberia S.A. v. Dougherty,* 87 S.D. 591, 212 N.W.2d 656 (1973) citing 37 Am.Jur.2d, Fraud & Deceit, § 223.

5. There is another, more technical reason why reliance cannot be found here. Viewed in its entirety, Mr. Mason's testimony reveals that he relied upon personal guarantees (to be forthcoming at some future date) and the bald statement of "net worth," *i.e.* it was in excess of $100,000. We have found that Mr. Vlotho recklessly represented that the corporation would be able to pay its bills on time, but we cannot find from the evidence that the narrower representation—net worth in excess of $100,000—was literally false. Accounting is a system for classifying, recording and summarizing financial transactions; each accounting system is based on assumptions. If one or more assumptions are changed, the total picture of a business enterprise can, of course, change radically. By using a tax election whereby investor's payments were treated differently than in the audited report, Mrs. Joliffe in her professional capacity had produced for the management a financial statement showing net worth in excess of $100,000. Emery Vlotho had the report which showed in truth a net worth in excess of $100,000. Thus, by relying on this statement alone, Mason relied on something other than the misrepresentation which this Court finds to be false. Logic demands that reliance, if any, be placed upon the false representation for liability to arise.

## V.

### SECOND THEORY OF RECOVERY— PREFERENTIAL PAYMENTS

Plaintiff urges that one or more directors ought to be held personally liable for part of the sum due and owing to Cargill for the reason that certain directors were recipients of payments in one form or another which payments ought to have been applied to the Cargill feed bill. In its Amended Complaint filed May 7, 1976, Plaintiff alleges that a wrongful, preferential payment of Thirty-Three Thousand, Two Hundred Fifty-Two Dollars and Fifty Cents ($33,252.50) was made to Edgemont Feeders, a business in which Jerry Feurhelm was a partner. Plaintiff urges in the Amended Complaint that all Defendants ought to be held jointly and severally liable for the amount of that alleged wrongful transfer. In Plaintiff's proposed Findings of Fact and Conclusions of Law filed August 26, 1976, both Jerry Feurhelm and Frank Seitzinger are cited as recipients of preferential payments.[6]

 Plaintiff relies upon an old doctrine in the field of corporate law known generally as the "trust fund doctrine" which derives from *Wood v. Dummer*, 3 Mason 308, Fed.Cas. No. 17,944 (1824). South Dakota adopted the doctrine in *Adam and Westlake Co. v. Deyette*, 8 S.D. 119, 65 N.W. 471 (1895). The thrust of the trust fund theory is that creditors should be able to rely upon a corporation's assets for payment of debts. The doctrine was applied frequently in South Dakota during the earlier part of this century and was applied often to failing bank corporations during the depression years. One of the clearest opinions concerning the doctrine in South Dakota law appears in the widely cited case of *Smith v. McCowan*, 60 S.D. 504, 244 N.W.

891 (1932). The last mention of the trust fund doctrine by the South Dakota Supreme Court appears to be in *Walton v. Commercial Credit Co.*, 69 S.D. 263, 9 N.W.2d 266 (1943) where the doctrine was not applied but certainly was not repudiated. In the opinion of this Court the trust fund doctrine is still viable in South Dakota although it is apparently waning in many jurisdictions.[7]

 The trust fund doctrine has a long and tortured history and has been the subject of much dispute,[8] and nowhere in case law, have we found the doctrine handily broken down into several parts each of which must be established by a preponderance of evidence for liability to lie. However, a most succinct yet accurate statement of the law is found in 15A, *Fletcher*, Cyclopedia Corporations, § 7369 (Perm. Ed. 1967) and reads as follows:

> The theory of the trust fund doctrine is that all of the assets of a corporation, immediately upon its becoming insolvent, become a trust fund for the benefit of all its creditors and that thereafter no liens nor rights can be created either voluntarily or by operation of law whereby one creditor is given an advantage over others.

Thus, for recovery a plaintiff must prove: (1) that the transfer complained of occurred while the debtor corporation was insolvent; (2) that the transfer depleted corporate assets; and (3) that plaintiff was damaged by virtue of the transfer(s).

 Moreover, as is implied in the last sentence of the quotation, the objective of this judicial doctrine is to *prevent* discrimination among creditors. "[T]he doctrine cannot be invoked by one creditor in his sole interest as against another

---

6. In a pretrial brief filed May 7, 1976, Don Emmick was also included as a recipient of an alleged wrongful, preferential payment. We assume Plaintiff no longer seeks to apply this theory to a transfer involving Mr. Emmick. (T. 369).

7. At least one commentator says the doctrine has been substantially repudiated. *See* H. C. Henn, Law of Corporations, 171 2d Ed. (1970).

8. See 15A, *Fletcher*, Cyclopedia Corporations, §§ 7369–7370 (Perm. Ed. 1967) and Hunt, "Trust Fund Theory and Some Substitutes For It," 12 Yale L.J. 63 (1902).

. . . ." Fletcher, *supra*, at § 7380. The Court cannot apply the trust fund theory in such manner as to prefer the Plaintiff in this instance, for this would clearly be a contradiction of rather than a fulfillment of the purpose underlying the trust fund doctrine. Because Plaintiff seeks to have the cash value of alleged wrongful transfers turned over to it for satisfaction of a debt, it seeks in effect to obtain a preference by the invocation of an anti-preference doctrine. We conclude that there can be no recovery on this theory even if the evidence contains proof of the three points enumerated, *supra*.

Having so concluded it may seem to be an exercise in futility to further consider the matter; however, for the sake of clarity and possibly for the benefit of a reviewing court, we will set out our findings with reference to the elements of the trust fund theory. Even if some mutation of the trust fund theory could be used by one creditor to the detriment of others, it is clear that not all of the elements have been proved. ·

*With reference to the question of whether or not transfers were made while the corporation was insolvent, the Court finds*: that on April 5, 1974, payment was made to Edgemont Feeders in the sum of $6,387.00 (Ex. 19, T. 280, 382) and that this payment was made in the form of feeder pigs (T. 392); that on June 4, 1974, Edgemont Feeders received another payment in the amount of $8,818.50 (T. 281, 393); that the Edgemont Feeders' account was reduced by $15,651.00 on August 28, 1974 by a payment in some form (T. 281, 394); and that a final payment of $2,396.00 was made by American Pork to Edgemont Feeders on February 11, 1975 (T. 281, 395). During the time period in which these transfers were made Jerry Feurhelm was a director of American Pork and had a one-third interest in the partnership known as Edgemont Feeders (T. 377 and 378).

The Court further finds that at some point prior to April 4, 1974, American Pork was unable to meet its current obligations.

(T. 248, 249, 257–259, 269). At a time prior to April 4, 1974, it was the opinion of the corporation's accountant that more money had to come into the corporation or a loan had to be obtained if the company was to keep doing business (T. 269). Furthermore, although we are unable to pinpoint a time at which American Pork's liabilities exceeded its assets, we are satisfied that when the financing possibilities fell through on June 4, 1974, (T. 479 & 480) there was no reasonable chance of continuing business as usual and meeting current obligations.

Because the trust fund doctrine does not require a judicial adjudication of insolvency before its principles apply, but rather comes into play when the business falls into a state where meeting obligations is for practical purposes impossible, we conclude that for purposes of the trust fund theory the corporation was "insolvent" during the time in which the latter three payments to Edgemont Feeders were made. It may have been insolvent at the time the first payment was made.

*With reference to the question of whether or not assets of the corporation were transferred to Edgemont Feeders, and whether or not such transfer of assets, if any, depleted corporation assets, the Court finds*: that very few feeder pigs belonged to American Pork (T. 220), and that those pigs which were transferred to Edgemont Feeders were pigs that belonged to the investors (T. 361). Apparently all pigs were marked in some manner so that each could be traced to a particular sow, and therefore · · it was possible to keep track of who owned particular feeder pigs.

The Court further finds, however, that American Pork could use the proceeds of feeder pig sales as the directors pleased (T. 227). The transcript contains many references to the directors' plan of using proceeds of feeder pig sales to pay the feed bills.

The issue of whether transfers to Edgemont Feeders depleted corporate "assets" is complex. On the one hand the corporation did not consider the pigs as corporate as-

sets, but on the other hand the corporation paid off obligations with the proceeds of pig sales. If pigs had not been transferred to Edgemont Feeders, it is at least possible that they would have been sold elsewhere and the cash could have gone to Cargill.

Nevertheless, we conclude that for purposes of the trust fund doctrine, the pigs would not be considered corporate assets, and even if transfers of pigs were made to Edgemont Feeders while American Pork was "insolvent," we cannot conclude that "corporate assets" were depleted by said transfers.

It may well be that this is an instance in which sophisticated accounting methods pose legal questions that cannot be answered by resort to concepts of a simpler era. It cannot be doubted that Edgemont Feeders competed with Cargill for payments, and that Jerry Feurhelm as a director of American Pork had a hand in getting some of the Edgemont Feeders' bill reduced. That pattern may well offend someone's sense of equity; moreover, it is possible that in a bankruptcy proceeding some of these transfers would have been found to be voidable preferences under § 60 (11 U.S.C. § 96).

But, this Court has been asked to apply the trust fund doctrine to a special set of facts. Twist the doctrine any way you please, it will not fit this situation. All we decide here is that Plaintiff can have no relief under the trust fund theory because it seeks to use an anti-preference doctrine to obtain a preference, and also because one element of the theory is not established; namely, that corporate "assets" were depleted.

Having decided that no recovery can be had from Jerry Feurhelm on this theory, this Court states that the same conclusion must be reached with reference to Frank Seitzinger. In addition, Mr. Seitzinger is further removed from the preference theory by the fact that he put feed into the corporation in exchange for whatever value he received. Payments to Mr. Seitzinger were not payments for an antecedent debt.

## VI.

## THIRD THEORY OF RECOVERY—PERSONAL GUARANTEE

Upon reflection it appears that plaintiff's final theory of recovery is based solely upon the allegation that Emery Vlotho personally guaranteed payment of a Ten Thousand Dollar ($10,000.00) corporate check issued on or about May 26, 1974. Before that date Cargill representatives had repeatedly asked for written personal guarantees of the account, and they were repeatedly assured that they (the written guarantees) would be forthcoming. Personal guarantee forms were mailed to the directors with five dollar ($5.00) checks for consideration (Tr. 57, 58), but no guarantee forms were signed by any of the defendant directors. Plaintiff is, therefore, in the position of being able to produce no written agreement whereby any director obligated himself to pay all or part of the Cargill account. There is no allegation that anyone other than Mr. Vlotho made an oral guarantee. Consequently, in analyzing this last theory of recovery we can focus exclusively upon the allegation that Emery Vlotho personally, orally guaranteed the last check given to Cargill.

Plaintiff has emphasized in its proposed findings certain testimony of Don Ketcham, district manager for Cargill Nutrena & Feeds at Lennox, South Dakota. Mr. Ketcham testified that Emery Vlotho emphatically and unequivocally assured him that payment would be made for the last three loads of feed (Tr. 132). On the basis of this alleged promise, plaintiff seeks to hold Mr. Vlotho liable as a guarantor. The applicable law is set out in S.D.C.L. § 56–1–4 and states:

> Except as prescribed by §§ 56–1–5 to 56–1–9, inclusive, a guarantee must be in writing and signed by the guarantor; but the writing need not express a consideration.

We think the statute is unambiguous; to be valid a guarantee must either be in writing or must be of a type that can be equated

with one of the exceptions in the list of exceptions noted in sections 5 through 9.

The exception upon which plaintiff would have the Court rely is contained in S.D.C.L. § 56–1–6 which provides:

A promise to answer for the obligation of another is deemed an original obligation of the promiser and need not be in writing where the creditor parts with value or enters into an obligation, in consideration of the obligation in respect to which the promise is made, in terms or under circumstances such as to render the party making the promise the principal debtor, and the person in whose behalf it is made his surety.

This statute has been construed by the South Dakota Supreme Court in several different settings. *See e. g. Meldrum v. Kenefick*, 15 S.D. 370, 89 N.W. 863 (1902); *Sprick Bros. Inv. Co. v. Whipple*, 33 S.D. 287, 145 N.W. 559 (1914); *Wood v. Dodge*, 23 S.D. 95, 120 N.W. 774 (1909).

The theory embodied in the quoted statute and explicated in the cited cases in essentially the theory that one who purports to guarantee a debt and does so in such a manner as to make himself the principal debtor, shall be held liable on the debt even though the debt was not guaranteed by a writing. The rule is a singularly logical one, for S.D.C.L. 56–1–1 defines guarantee as follows:

A guarantee is a promise to answer for the debt, default or miscarriage of another person.

Thus, by definition a "guarantor" is one who agrees to answer for the debt of a third person. Furthermore, when a person agrees to accept a debt as his own, it follows that said person is no longer a guarantor but in fact a principal debtor. It further follows logically that when a person is in fact a principal debtor, then semantics aside, he ought not be treated as a guarantor, and that in substance is the meaning of the statute.

*When it comes to proving a case*, the plaintiff is obliged to prove the following: (1) that plaintiff became a creditor by part-

ing with something of value; (2) that the defendant promised to answer for the obligation created; and (3) that the circumstances were such as to render the promisor the principal debtor.

Now with reference to point number one, the Court finds: that Cargill delivered to the American Pork feeding operation three loads of animal feed on or about May 26, 1974, that the value of the feed was approximately Ten Thousand Dollars ($10,000) and that Cargill has not to this date received payment for the feed.

With reference to the second point, the Court finds: that prior to the shipment of three loads of feed Emery Vlotho *promised, assured* and *guaranteed* that the payment would be good (Tr. 132).

The crucial fact-finding task centers on item number three; that is, we must carefully consider whether the circumstances are such that Emery Vlotho made himself the *de facto* principal debtor, we find: on April 18, 1974, Cargill completely cut off credit to American Pork by means of a letter sent by Don Ketcham, Cargill district manager, to Emery Vlotho (Tr. 129, Ex. 29). In early May Cargill representatives agreed to ship and did ship three loads of feed pursuant to Mr. Vlotho's statement by telephone to Bob Mason and Bob Ketcham in Minneapolis that "there would be no problem with the guarantees" (Tr. 130). Yet written guarantees were in fact a problem; none were forthcoming. Consequently, Don Ketcham informed Emery Vlotho that there would be no more feed shipments without a cashier's check or a money order or "something to that effect" (Tr. 131, 149). It was also stated by a Cargill representative that further shipment would be contingent upon the act of he, Vlotho, giving his word that payment would be made (Tr. 149).

At the time the final three loads of feed were shipped, Cargill did not intend to extend any credit to American Pork (Tr. 131). Prior to the delivery of these last three loads of feed, Emery Vlotho had personal knowledge that Cargill representatives had

cut off credit and that they intended that no more feed be shipped to the American Pork operation. With this knowledge in mind Vlotho came to Lennox when the Cargill district manager was gone, gave some person at the Lennox office a check, and thereby got the feed shipped (Tr. 131). He wrote the check without knowing whether or not the corporate account had money to cover it (Tr. 193). The check on the American Pork operation's account was no good and has not been honored to this day (Tr. 132).

The Court further finds that Emery Vlotho had much to gain by procuring animal feed. He had guaranteed a substantial indebtedness of American Pork by written guarantees (Tr. 198, 473, Ex. 36, Ex. 37); he personally had invested money in the enterprise (Tr. 456); and he had made his position with American Pork a full-time job (Tr. 452 and 453). Emery Vlotho had a personal stake in keeping the business going.

■ Under all of these circumstances we can and do conclude that Emery Vlotho was in effect the promisor and principal debtor. The Cargill people relied upon him, not American Pork, for payment for the three loads of feed. They knew that American Pork was not in a position to pay and were left to rely upon Emery Vlotho.[9] The circumstances indicate that Emery Vlotho assumed this Ten Thousand Dollar debt personally and ought consequently be held liable for it.[10]

The only alternative available would be to make a finding that Mr. Vlotho by his steadfast assurances and promises to Mr. Ketcham was representing the present financial position of American Pork to be

sound as of May 26, 1974. If we were to make such a finding, then we would be compelled to conclude that liability would lie as to Mr. Vlotho on the basis of the first theory of recovery proposed by plaintiff; namely, fraudulent misrepresentation. The corporation could not pay for the feed, and the seller most assuredly relied in this instance on Emery Vlotho's assurances that Cargill would be paid.

In short, Emery Vlotho either assumed that Ten Thousand Dollar ($10,000) debt as his own or he got three loads of feed by gross misrepresentations. We have made findings that support the first alternative and predicate liability on that theory.

## VII.

## SUMMARY

Plaintiff originally began this lawsuit with four theories of recovery. Prior to making any findings of fact, we rejected as a matter of law the theory that directors should be personally liable for debts incurred in the corporate name while the corporation certificate of authority was revoked. D.C., 415 F.Supp. 876. Fact finding has been done only with reference to the three remaining theories outlined in this opinion.

*Our most detailed findings were made with reference to the theory of fraudulent misrepresentation of the corporation's financial condition.* We found that the corporation's president, Emery Vlotho, falsely and recklessly represented to Cargill representatives that payments for feed could be timely made if feed were sold on a thirty-day credit plan. We further found, however, that recovery on this theory is barred

---

**9.** In *Wood v. Dodge, supra,* the South Dakota Supreme Court stated that if the third person (here American Pork) was relied upon at all for payment of the debt, then the "guarantor" could not be the principal debtor. We think that these facts fit within the law as enunciated in *Wood* because at the point in time when the last three loads of feed were shipped, no reliance whatever was placed upon American Pork for payment.

**10.** If Mr. Vlotho had delivered the check with the corporate name on it to Mr. Ketcham, we would find this conclusion difficult to make as it would appear that Mr. Ketcham had decided to take a chance on the corporation for one more time. Where the check was dropped off in Mr. Ketcham's absence, we have no difficulty finding that the arrangement between the parties must be understood by reference to the prior Ketcham-Vlotho conversations.

**512**

by Cargill's lack of reliance on the specific representation found to be false.

*Recovery upon the theory of preferential transfers was denied for two reasons.* First, the theory cannot, as a matter of law, be applied to the advantage of one creditor over other creditors. Second, the evidence does not show by a preponderance that corporate assets were depleted by transfers which were alleged to be preferential.

*Finally, we considered the theory of personal guarantees for the Ten Thousand Dollar ($10,000.00) debt created by the shipment of the last three loads of feed.* We found Emery Vlotho liable for this Ten Thousand Dollar ($10,000.00) debt because he personally promised to pay it, and feed was shipped in reliance on his promise, not in reliance on the corporation. However, we emphasize that even if we were to assume that Mr. Vlotho did not personally promise to pay the Ten Thousand Dollar ($10,000.00) debt, then from the evidence we would necessarily find that he grossly misrepresented the financial condition of the corporation, and liability would then lie under the theory of fraudulent misrepresentation.

All defendants in their respective capacities as officers, directors, and shareholders are found not to be liable for any of the debt to Cargill with the exception of Emery Vlotho's liability to the extent of Ten Thousand Dollars ($10,000.00). Judgment will be entered against Mr. Vlotho for the sum of Ten Thousand Dollars ($10,000.00) plus interest.

The foregoing shall constitute the Court's findings of fact and conclusions of law.