Dewey DAHL and Lavonne Dahl, Plaintiffs and Appellants.

v.

Peter SITTNER and Sittner Real Estate, Inc., Defendants and Appellees.

No. 16018.

Supreme Court of South Dakota.

Argued May 25, 1988.

Decided Sept. 14, 1988.

Rodney C. Lefholz of Fousek, Lefholz & Mairose, Rapid City, Patrick M. Ginsbach of Farrell, Farrell & Ginsbach, Hot Springs, for plaintiffs and appellants.

Dale L. Morman of Morman, Smit, Shepard & Hughes, Sturgis, Randolph J. Seiler of Seiler & Cain, Mobridge, for defendants and appellees.

WUEST, Chief Justice.

Dewey and LaVonne Dahl (Dahls) appeal an order granting summary judgment in favor of Peter Sittner (Sittner) in an action charging Sittner with fraud and misrepresentation and breach of fiduciary duty regarding the sale of the Dahls' ranch. We reverse and remand for further proceedings.

On July 25, 1979, the Dahls and Sittner signed a listing contract to sell the Dahls' 1400 acre ranch in Ziebach County, South Dakota. The Dahls had been contemplating selling their ranch because Dewey's back problems and pending back surgery placed serious doubt on his ability to continue ranching.

Under the terms of the listing agreement, Sittner, a realtor licensed in South Dakota and North Dakota,[1] agreed to use

his best efforts to locate a buyer at the Dahls' asking price of $265 per acre.[2] The terms further provided that the purchase price was to be paid entirely in cash and that Sittner would receive a 5% commission in the event a suitable buyer was found. The duration of the listing agreement was one year.

On February 20, 1980, Sittner entered a contract with Donna Klock (Klock),[3] a real estate broker from Minnesota. This contract stated that Klock could solicit buyers for the Dahl property and present them to Sittner. If Sittner then completed a sale, Klock would receive 40% of Sittner's commission. Sittner cancelled this agreement in July, 1980, but the parties renewed it on December 4, 1980.

Klock first contacted the Dahls on January 28, 1981, when she brought them a handwritten listing agreement running from that date through March 13, 1981. This listing contract was written on one of Sittner's forms and appeared to bear Sittner's signature. Sittner, however, claims that he was unaware of Klock's meeting with the Dahls and that the signature on this agreement was not his.

Klock again visited the Dahls at their ranch in the summer of 1981. This time she accompanied Sittner. Sittner formally introduced Klock to the Dahls and indicated that she would be assisting him in his efforts to sell the Dahls' ranch. Although it is not clear whether Sittner explained the extent of Klock's involvement, the Dahls contend that Sittner stated Klock would be "handling the sale of their ranch."

On October 27, 1981, Sittner brought the Dahls a third listing contract which was signed by both parties. This agreement listed the Dahls' ranch for sale at $280 per acre. In all other aspects, the agreement was identical to the first listing contract.

1. Sittner conducted his real estate business as Sittner Real Estate, Inc. in Mobridge, South Dakota. In 1983, Sittner surrendered his South Dakota realtor's license.

2. At that time, $265 per acre was quite high for the area. The Dahls, however, insisted on a price that would not bring immediate interest because Dewey was not yet severely incapacitated and they were not entirely ready to sell their ranch. In addition, the Dahls hoped to realize sufficient proceeds from the sale of their ranch, livestock and equipment to satisfy a $350,000 FmHA mortgage and still have money left over for their retirement.

3. Klock is now deceased.

Prior to this meeting with the Dahls, Sittner had little, if any, contact with them. Klock, on the other hand, visited the Dahls frequently. In addition to bringing potential buyers to the Dahl property and telephoning the Dahls regarding the sale of their ranch, Klock also stopped at the ranch for personal visits.

In February, 1982, Klock telephoned the Dahls and stated that she found a buyer for their ranch. Klock then drove to the ranch to discuss the sale of the Dahls' livestock and equipment. Klock informed the Dahls that she arranged for Duane Harter (Harter), an auctioneer from Minnesota, to sell their personal property at a public auction and that Harter would be contacting them. The Dahls subsequently received a telephone call from Harter and the two parties signed an auction contract on February 21, 1982. The agreement set the auction date for March 2, 1982, and provided that Harter was to conduct the sale of not only the Dahls' livestock and equipment but also the real estate. Although a buyer for the land supposedly had been found, Klock's and Harter's plan was to "exercise" the real estate at the auction to see if someone would bid higher than the price the secured buyer had agreed to pay. This auction was cancelled when Klock informed the Dahls that the buyer subsequently revoked his offer.

The Dahls entered another auction contract with Harter and Irvin Salzer (Salzer), an auctioneer from Timber Lake, South Dakota, after Klock apparently informed them that she had received another offer to purchase the ranch. This auction was set for March 15, 1982. Klock and Harter again wanted to "exercise" the real estate to see if the auction would produce a higher price. Because the Dahls were not confident that Harter should be trusted to handle the transaction alone, they instructed Salzer to direct the auction.

A few days before the auction, the Dahls telephoned Sittner and requested that Harter be given the abstracts of title to their ranch. Sittner had not communicated with the Dahls since the previous October and just recently had learned through a published sale bill that the real estate was being auctioned along with the livestock and equipment. He was aware of neither Harter's involvement nor the alleged buyer Klock had located. Although Sittner did not understand why the Dahls were auctioning their real property and apparently breaching the agreement giving him the exclusive right to sell, Sittner failed to ask the Dahls about the transpiration of these recent events. The Dahls similarly failed to inquire of Sittner whether he had authorized the auction sale, whether he would receive a commission if the land sold by auction, whether Klock was still "working for" him, or even whether he or Klock had received a firm offer to purchase the land. Nonetheless, Sittner delivered the abstracts of title to Harter on March 12, 1982. At that time, however, Sittner expressed to Harter his intention to get his commission on the sale of the land even though Harter and Salzer would receive a 10% commission if the real estate sold at the auction.

The auction was conducted on March 15, 1982. Several bids were received on the real estate, but none of them were accepted. Prior to the start of the auction, the Dahls asked Klock if she had a suitable buyer for their ranch. Klock assured them that an offer to purchase had been signed and that $10,000 had been deposited in an escrow account in Mobridge, South Dakota. She further stated that another potential buyer was going to be present at the auction. Klock, however, did not show the Dahls the purchase offer until after auction.

The Dahls found the terms of this offer to purchase unacceptable. Although the stated price was $295 per acre, the purchase price was to be paid not in cash, but by assuming the existing FmHA mortgage. The difference between the purchase price and the mortgage was to be paid to the Dahls over a period of twenty-five years. Interest on the unpaid balance would accrue annually at a rate of 9%. If the purchase price was paid in full within eighteen months after the contract for deed was signed, the buyer was entitled to a 17.5% discount. Finally, the $10,000 represented by Klock to be on deposit in an

escrow account was instead stated as a promissory note.

The offer to purchase was signed on March 6, 1982, on behalf of Robert Briggs (Briggs), a real estate investor from Minnesota. It is not clear whether Klock, Harter or both participated in preparing the offer. The offer was written on one of Sittner's forms, but he denies having any knowledge about the offer, including the use of his form.

No sale of the Dahls' real estate occurred and the Dahls subsequently filed suit against Sittner alleging fraud on behalf of Sittner's agent, Klock. The Dahls claimed that Briggs' offer to purchase was a "sham" and that they sold their personal property after relying on Klock's representations that she had a buyer and a valid offer to purchase their ranch. The Dahls further contended that they were effectively displaced from their ranching business by the auction sale of their personal property as a result of their reliance on Klock and that they were damaged because their real property had not been sold.

Sittner asserted that he was completely unaware of Klock's activities and that Klock was acting on her own and outside the scope of their agreement. He further claimed that at no time did he make any representations to the Dahls that Klock was handling the sale of their ranch or that she had any authority from him whatsoever.

On August 28, 1987, Sittner brought a motion for summary judgment pursuant to SDCL 15–6–56(b), contending that the Dahls had demonstrated no genuine issue of material fact. The trial court granted Sittner's motion, essentially noting that (1) nothing in the record established a relationship among Klock, Harter and Sittner that would create a duty for Sittner toward the Dahls; (2) if the Dahl's land sold at auction, the auctioneers would receive a 10% commission and Sittner would receive nothing; (3) the Dahls were negligent in breaching their agreement with Sittner and, therefore, were precluded from seeking recovery from him on the theory of apparent authority; and (4) since Briggs' purchase

offer was legitimate, no fraud was committed by Klock and the damages claimed by the Dahls, if any, resulted from their refusal to accept his offer.

The only question presented to us by this appeal is whether the trial court erred in granting summary judgment. We believe that it did. The aforementioned matters present genuine issues of material fact upon which reasonable minds could differ.

 Summary judgment is properly awarded only when the moving party clearly shows that he is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. SDCL 15–6–56(c); *Groseth Intern., Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 164 (S.D.1987); *Bego v. Gordon*, 407 N.W.2d 801, 803–04 (S.D. 1987); *Hamaker v. Kenwel–Jackson Mach., Inc.*, 387 N.W.2d 515, 517 (S.D. 1986). "The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party." *Groseth Intern.*, 410 N.W.2d at 164. *See also Wilson v. Great Northern Ry. Co.*, 83 S.D. 207, 157 N.W.2d 19 (1968). Summary judgment is an extreme remedy and is not intended as a substitute for a trial. *Bego*, 407 N.W.2d at 804; *Wilson*, 83 S.D. at 212, 157 N.W.2d at 21. A belief that the nonmoving party will not prevail at trial is an inappropriate basis for granting summary judgment on issues not shown to be sham, frivolous, or so unsubstantial as to obviate the futility of their litigation. *Laber v. Koch*, 383 N.W.2d 490, 492 (S.D.1986); *American Indian Agr. Credit v. Fort Pierre*, 379 N.W.2d 318, 320 (S.D.1985); *Wilson*, 83 S.D. at 212, 157 N.W.2d at 21. If reasonable persons, upon examining the evidence, might reach different conclusions, a motion for summary judgment should be denied and the case tried on the merits. *See Laber*, 383 N.W.2d at 493.

 In support of our conclusion that the motion for summary judgment should have been denied, we examine the general rules of agency law. An agency relationship is defined as "the representation of one called the principal by another called the agent in dealing with third persons."

SDCL 59-1-1. This relationship is either actual or ostensible. Actual agency exists if the relationship is expressly created by an agreement whereby the principal appoints his agent who agrees to serve in that capacity. SDCL 59-1-4. Ostensible agency exists where the law implies an agency relationship because the principal affirmatively, intentionally, or by lack of ordinary care causes a third party to believe another is serving as his agent. SDCL 59-1-5; *Kasselder v. Kapperman*, 316 N.W.2d 628, 630 (S.D.1982); *Kirkus v. Bender*, 34 S.D. 317, 319, 148 N.W. 513 (1914). Whether an agency relationship has in fact been created depends upon the relations of the parties as they exist under their agreement or acts. *Kasselder*, 316 N.W.2d at 630.

■ An agent's authority, like the agency relationship itself, can be either actual or ostensible. "Actual authority is such as a principal intentionally confers upon the agent, or intentionally or by want of ordinary care, allows the agent to believe himself to possess." SDCL 59-3-2. Ostensible or apparent authority is "such as a principal intentionally, or by want of ordinary care, causes or allows a third person to believe the agent to possess." SDCL 59-3-3; *Leafgreen v. American Family Mut. Ins. Co.*, 393 N.W.2d 275, 277 (S.D. 1986).

■ Generally, a principal may be held liable for the fraud and deceit of his agent acting within the scope of his actual or apparent authority, even though the principal was unaware of or received no benefit from the agent's conduct. SDCL 59-6-1; *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir.1967); *Leafgreen*, 393 N.W.2d at 277. Whether or not an agent is acting within the scope of his apparent authority is to be determined as a question of fact from all the circumstances of the transaction and the nature of the principal's business. If the apparent authority can only be established through the acts, declarations and conduct of the agent and is not in some way traceable to the principal, no liability will be imposed on him. *Draemel v. Rufenacht, Bromagen & Hertz, Inc.*,

223 Neb. 645, 651, 392 N.W.2d 759, 763 (1986); *Kasselder*, 316 N.W.2d at 630.

■ Once ostensible agency is determined, the principal is bound by the acts of his agent to only those persons who have "in good faith, and without negligence, incurred a liability or parted with value upon the faith thereof." SDCL 59-6-3. The third person dealing with the agent, therefore, must show not only damages resulting from his reliance on the appearance of authority, but also reasonable diligence and prudence in ascertaining the fact of the agency and the nature and extent of the agent's authority. 3 Am.Jur.2d *Agency* §§ 80, 83 at 587, 592-93 (1986).

■ Applying the general rules of agency law to the facts before us, with a view of the propriety of summary judgment, we believe that a genuine issue of fact exists as to whether an agency relationship, either actual or ostensible, existed between Sittner and Klock. If Klock was in fact acting as Sittner's agent, there must likewise exist genuine issues as to whether and, if so, to what extent Sittner clothed her with the actual or apparent authority to deal with the Dahls. These material issues of fact are best determined by a jury after the presentation of evidence regarding (1) Sittner's representations to the Dahls when he introduced Klock to them, (2) his subsequent conduct, and (3) the reasonableness of the Dahls' belief that Klock was Sittner's agent and that she was authorized to conduct business with them.

■ If, in fact, the evidence should establish that Klock was not exceeding her authority as Sittner's agent in dealing with the Dahls and that the Dahls were prudent in ascertaining this fact, additional issues of material fact exist. Such factual questions include whether Klock's representations to the Dahls that she had located a suitable buyer prior to the auction sale were fraudulent and whether the Dahls in fact relied upon the claimed fraud to their detriment. These questions of fact should also be resolved by the jury. *See Laber*, 383 N.W.2d at 492; *Commercial Credit*

*Equipment Corp. v. Johnson,* 87 S.D. 411, 416, 209 N.W.2d 548, 551 (1973).

"To prove fraud there must be a misrepresentation: (1) known to be such (or recklessly conceived) by the party making it; (2) made for the purpose of inducing the other party to act; and (3) relied on to the detriment of the innocent party." *Sperry Corp. v. Schaffer,* 394 N.W.2d 727, 730 (S.D.1986). *See also Northwest Realty Company v. Colling,* 82 S.D. 421, 147 N.W.2d 675 (1967). The record shows that Klock informed the Dahls prior to the sale that a buyer had been located and that $10,000 had been deposited in an escrow account. The record further shows that the $10,000 earnest money was in the form of a promissory note instead of cash and that other terms in Briggs' offer to purchase also differed from those specified in the Dahls' listing contract. The Dahls were unaware of these facts at the time their livestock and equipment were sold. Because of the conflicting claims of the parties, we believe that reasonable minds could differ as to whether Briggs was a suitable buyer as Klock had represented. If an issue of fact exists as to whether Klock's representations were fraudulent, a genuine issue must also exist as to whether the Dahls relied upon that alleged fraud and were damaged as a result.

We are mindful of the fact that the evidence may ultimately be insufficient to establish liability on Sittner. That, however, is not the question to be addressed at this point. The question here is simply whether genuine issues of material facts exist as to these matters. We believe that such issues do exist and that the Dahls are entitled to have a jury determine the agency question and the other issues under the proper instructions.

Accordingly, we reverse and remand for further proceedings.

All the Justices concur.