# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 08-1288/1292/1394

_____

American Prairie Construction     *
Company, formerly known as North     *
Central Construction, Inc.,     *
    *
       Appellee/Cross-Appellant,     *
    *    Appeals from the United States
      v.     *    District Court for the
    *    District of South Dakota.
John Hoich,     *
    *
       Appellant/Cross-Appellee,     *
    *
      v.     *
    *
Tri-State Financial, LLC,     *
    *
       Appellant/Cross-Appellee.     *

_____

Submitted: November 12, 2008
Filed: March 24, 2009

_____

Before MURPHY, RILEY, and GRUENDER, Circuit Judges.

_____

RILEY, Circuit Judge.

Tri-State Financial, LLC (TSF) and John Hoich (Hoich) appeal the district court's finding that TSF and Hoich were parties to a binding settlement agreement

formed with North Central Construction, Inc. (NCC)[1] on June 21, 2004, during bankruptcy proceedings for Tri-State Ethanol (TSE). The district court found TSF and Hoich breached the agreement and were jointly and severally liable to NCC in the amount of $2.5 million. For reasons discussed below, this opinion addresses only Hoich's claims on appeal, and we reverse the district court's judgment as to Hoich.

## I.    BACKGROUND
### A.    Tri-State Ethanol Bankruptcy Proceedings

Throughout 2001, NCC built an ethanol plant in Rosholt, South Dakota. Although TSE was the plant owner, NCC retained a $1 million equity interest in the plant. The plant began operations in 2002, but was not profitable. When TSE failed to pay NCC for construction of the plant, NCC filed a mechanic's lien against the property on December 31, 2002, and initiated foreclosure proceedings in South Dakota state court. On that same date, an explosion occurred at the plant while the plant was shut down for repairs. TSE claimed it was unable to obtain further financing for the plant due to NCC's mechanic's lien, and in May 2003, TSE filed a Chapter 11 bankruptcy petition in the Bankruptcy Court for the District of South Dakota. NCC's state foreclosure action was stayed by the bankruptcy petition filing. In the course of the bankruptcy proceedings, TSE listed NCC as an unsecured nonpriority creditor with a claim consisting of $1,712,253 for construction costs. In response, NCC filed an adversary action in the bankruptcy court on July 14, 2003, to determine the validity, priority, and extent of its liens, claiming a priority secured claim for unpaid construction fees in the amount of $3,611,883.

In June 2003, a group of investors formed TSF, a shell-corporation which was designed solely to provide funding to TSE in an effort to return the ethanol plant to operation. On September 25, 2003, TSE filed a motion in the bankruptcy action seeking court approval of post-petition financing, in which TSF would provide TSE

---

[1]NCC was later renamed American Prairie Construction Co., but has continued to use the name NCC throughout this litigation.

with $2 million for plant improvements, but only if TSF's financing would be treated as a secured priority claim. On October 22, 2003, TSE's motion was heard in the bankruptcy court. In support of the post-petition financing motion, Hoich, an investor in both TSE and TSF, testified he had a net worth of $25 to $30 million and he could personally guarantee funds for the planned improvements, if his investment were given priority. Hoich clarified, however, he was only willing to guarantee funding for future improvements, and not for the payment of other creditors, adding he personally already had lost $2.5 million. The bankruptcy court denied the motion on December 12, 2003. Nevertheless, TSF provided funds to TSE for plant improvements without the bankruptcy court's knowledge.

In March 2004, TSE filed a Modified Chapter 11 Plan. NCC, along with creditor Interstate Electric and Engineering Company (Interstate), objected to their treatment under the plan. The plan provided NCC's construction claim would be treated as a Class 12 unsecured non-priority claim to be paid over 10 years, and NCC's $1 million equity claim would receive no distribution. TSF contends NCC and Interstate's opposition was the major hurdle to confirmation of the modified plan.

### B.    Settlement Discussions

After TSE filed its modified plan, the United States Bankruptcy Trustee (Trustee) filed a motion to dismiss the Chapter 11 bankruptcy, or in the alternative, to convert the Chapter 11 to a Chapter 7 bankruptcy. A hearing was scheduled for June 21, 2004, to address plan confirmation and the motion to dismiss. The scheduled hearing prompted a meeting on June 14, 2004, between TSF representatives Hoich, David Ruback (Ruback), Joe Vacanti, and others, and NCC representatives Peter Rudeen (Rudeen), NCC's CEO, and Ace Brant, NCC's owner. Hoich represented TSF in the settlement discussions. TSF's goal was to negotiate an agreement in which TSF could purchase NCC's claims against the bankruptcy estate, eliminating objections to the modified plan and allowing the plan to be approved at the June 21, 2004 hearing. No agreement was reached on June 14, 2004.

Hoich and Rudeen continued settlement negotiations in a series of telephone conversations between Friday, June 18, through Sunday, June 20, 2004. Hoich was in close contact with other TSF representatives during this time, including Ruback, TSF's manager at the time, and James Jandrain (Jandrain), a certified public accountant who performed many services for TSF throughout the bankruptcy proceedings. After Hoich spoke with Ruback and Jandrain, they decided Hoich would offer NCC $2.5 million in exchange for NCC's claims and interests in TSE. Hoich offered Rudeen this deal on the evening before the confirmation hearing, but it was not made clear who would provide the funds. The following morning, June 21, 2004, shortly before the hearing commenced, Rudeen called Hoich and accepted the offer.

Hoich did not attend the June 21 hearing. Several other TSF representatives traveled from Omaha, Nebraska, to Sioux Falls, South Dakota, for the hearing, including Ruback, Jandrain, and TSF's newly hired attorney, Jerrold Strasheim (Strasheim). Before the hearing, TSF representatives met with NCC attorney Ron Hall (Hall) and others to discuss how the settlement should be structured. Interstate representatives were also present for the discussions. Throughout the meeting, Hall took notes on a legal pad and passed the notes around for others to review.

Shortly after the meeting, the confirmation hearing commenced. Hall read his notes into the record and indicated, with no objection, that his notes represented the settlement agreement among TSF, Interstate, and NCC. Several parties were present, including at least sixteen attorneys, and a significant amount of confusion existed about the terms of the agreement. Strasheim, newly representing TSF, seemed confused about who he was representing in the course of the hearing, stating, "Your Honor, on behalf of Interstate, I would say that that is the deal." Strasheim was then interrupted and reminded he was representing TSF, not Interstate. At another point in the proceeding, Hall stated Strasheim did not represent Hoich, "but it [was his] understanding that Mr. Hoych [sic] personally committed to this deal," and added, "Jandrain is here to confirm that." Jandrain, who was in the gallery, was never asked

to confirm whether Hoich had agreed to be bound personally under the settlement agreement.

The terms of the "settlement agreement" read into the record cannot easily be summarized. TSF agreed to purchase the various claims of NCC and Interstate for $2.5 million, with $475,000 payable to Interstate. The alleged agreement also contained provisions stating NCC and Interstate would not object to TSE's plan confirmation. The reading detailed which claims were being purchased and from which class the claims could be found in TSE's Chapter 11 bankruptcy plan. There was also a provision allowing Interstate to retain one of its claims which was to be paid by TSE's bankruptcy estate over a period of three years.

At the conclusion of the June 21, 2004 hearing, the bankruptcy court requested an amended plan be filed by June 25, 2004, in an effort to expedite the process. The court scheduled a confirmation hearing for the amended plan on July 28, 2004. Before the confirmation hearing took place, the parties began to discuss the settlement agreement, and to exchange drafts of proposed documents, in an effort to memorialize the settlement discussed during the June 21, 2004 hearing. Conflicts arose when TSF claimed the agreement was subject to confirmation of the amended plan. NCC vehemently denied the existence of such a condition. In the meantime, TSF raised $2.5 million from investors and deposited the money into a trust account with Strasheim's law firm. Hoich did not contribute to these funds.

When NCC and TSF failed to agree on the written terms for the formal agreement, NCC filed a motion on July 14, 2004, asking the bankruptcy court to enforce the June 21, 2004 agreement. NCC and Interstate also filed new objections to plan confirmation and ballots rejecting the modified plan in the event TSF failed to perform under the agreement. The motion to approve the settlement agreement and the motion to confirm the modified plan were heard on July 27, 2004.

Shortly before the hearing, NCC attempted to perform its obligations under the "settlement agreement" by tendering to TSF an assignment of its claims against, and its interests in, TSE. TSF and Hoich declined to accept the tendered assignment and refused to pay NCC. When the hearing convened, TSE and TSF did not pursue confirmation of TSE's modified plan, but instead, joined in a pending motion by the Trustee asking the court to dismiss the Chapter 11 proceedings. The bankruptcy court denied the motion to dismiss and instead converted TSE's Chapter 11 reorganization to a Chapter 7 liquidation.

The bankruptcy court also denied NCC's motion to approve the settlement agreement, finding the settlement agreement was not conditional in any manner. The court noted the parties disagreed as to whether a meeting of the minds occurred, but the court concluded it did not have jurisdiction to force TSF, a third party not directly involved in the bankruptcy, to consummate a deal. TSF returned the $2.5 million, which had been placed in a trust account, to the contributors.

### C.    The Present Contract Action

Approximately one week after the bankruptcy court's ruling, NCC filed the present lawsuit in federal district court seeking to enforce the alleged settlement agreement against TSF and Hoich. The district court stayed the action several times as the parties attempted to reach a settlement in bankruptcy court. At the same time, TSE's assets were being sold, and secured creditors and priority administrative expenses were being paid from the bankruptcy estate.

While the action was stayed, a magistrate unsuccessfully attempted to mediate a second settlement agreement between NCC and TSF. Almost a year later, on June 12, 2006, a third settlement agreement on NCC's claim for construction costs was negotiated between the Trustee and NCC. TSF was not a party to this agreement. The terms of the settlement were: (1) the Trustee would pay $2 million, plus interest, to NCC; (2) NCC would release all claims pending in the bankruptcy proceeding, except

-6-

its $1 million equity claim; and (3) NCC would dismiss its state court foreclosure action. The bankruptcy court granted the Trustee's motion to approve the settlement agreement, but by that time, the district court had lifted the stay in the present case and set a trial date. As a result, the bankruptcy court was unable to enforce the settlement agreement between the Trustee and NCC.

The present contract action proceeded to trial on August 1, 2007. The district court issued an opinion and order on December 27, 2007, holding the original settlement agreement, read into the bankruptcy court record on June 21, 2004, was a binding and enforceable agreement which was breached by TSF and Hoich when they failed to perform. The district court awarded NCC $2.5 million in damages, plus pre-judgment interest, for which TSF and Hoich were jointly and severally liable. The award was later reduced to $2,025,000, plus interest, pursuant to a stipulation previously made by NCC. TSF and Hoich appealed the findings of the district court, and NCC cross-appealed.

## II.   DISCUSSION

### A.   Bankruptcy Stay

On November 12, 2008, counsel for TSF, Hoich, and NCC orally presented their arguments to this court. After that date, TSF filed bankruptcy. Generally, when a party files a Chapter 11 bankruptcy petition, all proceedings "against the debtor" are stayed. See 11 U.S.C § 362(a). Whether a proceeding is deemed to be against the debtor is ascertained "from an examination of the debtor's status at the *initial* proceeding." Farley v. Henson, 2 F.3d 273, 275 (8th Cir. 1993) (quoting Cathey v. Johns-Manville Sales Corp., 711 F.2d 60, 62 (6th Cir. 1983)). The initial contract action was brought by NCC against TSF and Hoich. Consequently, this proceeding is stayed automatically as to the issues presented by TSF on appeal and the issues raised by NCC in its cross-appeal until further order by the bankruptcy court.

This stay does not extend to Hoich's issues on appeal. "It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants." Teachers Ins. and Annuity Ass'n of Am. v. Butler, 803 F.2d 61, 65 (2d Cir. 1986) (listing cases). In Croyden Assocs. v. Alleco, Inc., 969 F.2d 675, 677 (8th Cir. 1992) (quoting Maritime Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1205 (3d Cir. 1992)), our court was "persuaded that the stay required by section 362 should extend only to claims against [the debtor], and that the stay is not available to nonbankrupt codefendants, 'even if they are in a similar legal or factual nexus with the debtor.'" We proceed with only those issues raised by Hoich.

Hoich maintains the district court erred when it (1) denied Hoich's motion for recusal and disqualification; (2) found Hoich was a party to the June 21, 2004 agreement; (3) found Hoich personally guaranteed the June, 21, 2004 agreement; and (4) improperly took judicial notice of certain documents.

### B.      Motion for Recusal and Disqualification

"We review a denial of a motion to recuse for an abuse of discretion." Trammel v. Simmons First Bank of Searcy, 345 F.3d 611, 612 (8th Cir. 2003) (citation omitted). Pursuant to 28 U.S.C. § 455(a), "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." A judge is also required to recuse himself when "he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). "We apply an objective standard of reasonableness in determining whether recusal is required. 'Under § 455(a), "disqualification is required if a reasonable person who knew the circumstances would question the judge's impartiality, even though no actual bias or prejudice has been shown."'" Fletcher v. Conoco Pipe Line Co., 323 F.3d 661, 664 (8th Cir. 2003) (quoting United States v. Tucker, 78 F.3d 1313, 1324 (8th Cir. 1996)).

"A judge is presumed to be impartial, and 'the party seeking disqualification bears the substantial burden of proving otherwise.'" United States v. Denton, 434 F.3d 1104, 1111 (8th Cir. 2006) (citing Fletcher, 323 F.3d at 664). In order to "establish bias or prejudice from in court conduct," a party must show "the judge had a disposition 'so extreme as to display a clear inability to render a fair judgment.'" Id. (quoting Liteky v. United States, 510 U.S. 540, 551 (1994)). "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Id. (quoting Liteky, 510 U.S. at 555).

Before a trial date was set, the district court heard various appeals arising out of the underlying bankruptcy proceedings. Hoich claims two of the district court's opinions in the bankruptcy appeals demonstrate the court pre-determined whether a binding agreement was formed on June 21, 2004. In one opinion, the district court stated,

> We know that TSF and [NCC ] . . . reached a settlement in the presence of the bankruptcy judge which was on the record in June of 2004. This was followed by TSF reneging on the settlement by adding terms not previously stated. The bankruptcy judge did not enforce the settlement and allowed TSF to escape from it. Of course, this would be frustrating to any judge.

After Hoich filed a motion asking the district judge to recuse himself, the district judge responded in an opinion thoroughly addressing Hoich's concerns. The judge admitted he "erred in stating that settlements had been reached," and continued by resolving, "they may or may not have been reached and the trial of this action will answer that question." American Prairie Const. Co. v. Tri-State Financial, LLC, No. 04-1016, 2007 WL 2156615, at *6 (D.S.D. July 25, 2007).

The district court's appellate opinions were based on facts and evidence derived from the related bankruptcy proceedings. Hoich now has the burden of proving the district court "display[ed] a deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky, 510 U.S. at 555. Hoich cannot meet this burden. The district judge admitted an error in stating a settlement had been reached, but the statements in the district court's opinions and in the transcripts do not demonstrate a "deep-seated favoritism or antagonism," nor do the statements display a disposition so extreme as to render fair judgment impossible. Id. The district court did not abuse its discretion in denying Hoich's motion for recusal and disqualification.

In addition, Hoich's motion for recusal was not timely filed. We have repeatedly held, "a claim for judicial recusal under section 455 'will not be considered unless timely made.'" Fletcher, 323 F.3d at 664 (quoting United States v. Bauer, 19 F.3d 409, 414 (8th Cir. 1994)). For such a motion to be considered timely, the party must bring its motion "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." Id. (quoting Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d 326, 333 (2d Cir. 1987)).

Hoich filed his recusal motion on June 21, 2007, less than six weeks before trial. Hoich argues, because he was not a party to the bankruptcy proceedings, Hoich's counsel did not learn of the district court's opinions upon which his motion was based until June 3, 2007. However, Hoich played a prominent role throughout the bankruptcy proceedings and should have been monitoring the case status.

The district court's findings regarding the untimeliness of Hoich's recusal motion were not clearly erroneous. The recusal motion was properly denied by the district court.[2]

---

[2]Refereeing heated advocacy can be frustrating and irritating for the trial judge, who is human afterall, and who is likely to form strong opinions regarding counsel, parties, and witnesses. Forming judicial opinions on credibility concerning parties

## C. Hoich's Liability Under the Settlement Agreement

The district court concluded Hoich was a principal in a settlement agreement formed between TSF, Hoich, Interstate, NCC, and TSE on June 21, 2004, in TSE's bankruptcy proceedings. See American Prairie Const. Co. v. Tri-State Financial, LLC, 529 F. Supp. 2d 1061, 1080 (D.S.D. 2007). In the alternative, the district court found Hoich "made a personal financial commitment to guarantee the payment of the settlement proceeds." Id. at 1078, 1080. Hoich appeals each of these findings.

### 1. Guarantor Liability

NCC did not claim, either in its complaint or at trial, Hoich was a guarantor of the settlement agreement. The district court held, sua sponte, Hoich was a guarantor. Hoich claims the district court erred by doing so, citing Armstrong Cork Co. v. Lyons, 366 F.2d 206, 208 (8th Cir. 1966) (quoting Sylvan Beach v. Koch, 140 F.2d 852, 861 (8th Cir. 1944)), which states,

> A court may not, without the consent of all persons affected, enter a judgment which goes beyond the claim asserted in the pleadings. Unless all parties in interest are in court and have voluntarily litigated some issue not within the pleadings, the court can consider only the issues made by the pleadings, and the judgment may not extend beyond such issues nor beyond the scope of the relief demanded.

The purpose of this rule is to "assure to every person his day in court before judgment is pronounced against him." Id. (quoting Sylvan Beach, 140 F.2d at 862). NCC did not plead or pursue this guarantee claim to put Hoich on notice of the allegation as the

and their counsel is expected; in fact, necessary. This record does not reflect any prejudice or bias or any inability to render a fair, impartial judgment on the part of the district judge.

-11-

law requires. Regardless, the facts do not support the district court's finding of guarantor liability.

Under South Dakota law,[3] "[a] guaranty is a promise to answer for the debt, default, or miscarriage of another person." S.D. Codified Laws § 56-1-1. "Except as prescribed by §§ 56-1-5 to 56-1-9, inclusive, a guaranty must be in writing and signed by the guarantor." S.D. Codified Laws § 56-1-4. Thus, "to be valid[,] a guarantee must either be in writing or must be of a type that can be equated with one of the [statutory] exceptions." Cargill, Inc. v. American Pork Producers, Inc., 426 F. Supp. 499, 509-10 (D.S.D. 1977).

The district court held Hoich "made a personal financial commitment to guarantee the payment of the settlement proceeds," and "[t]hat commitment was reduced to writing when it was read onto the record." American Prairie Const. Co., 529 F. Supp. 2d at 1078. We disagree. Hoich did not sign a written contract to guarantee the settlement agreement. Hoich was not present at the June 21, 2004 hearing, and could not have made a personal financial commitment on the record. At no time during the hearing did any agent on behalf of Hoich expressly represent Hoich was guaranteeing the alleged settlement agreement. Hoich can only be liable if the alleged guarantee falls under one of the enumerated statutory exceptions.

The district court declared, "Even if not entered into the record, NCC agreed to part with the value of its claims, and did tender its claims, under circumstances such

---

[3]We apply the law of South Dakota because: (1) if a contract for a guarantee was formed, it was formed in South Dakota where the settlement hearing took place, (2) any contract would have been performed in South Dakota, and (3) the parties make clear their understanding that South Dakota law governs the dispute by citing primarily South Dakota law in their briefs. See Robert A. Brazener, Annotation, Conflict of Laws: What Law Governs Validity and Construction of Written Guaranty, 72 A.L.R.3d 1180 (1976).

-12-

as to render Hoich a guarantor." Id.  To support this finding, the district court cited S.D. Codified Laws § 56-1-6, which states,

> A promise to answer for the obligation of another is deemed an original obligation of the promiser and need not be in writing where the creditor parts with value or enters into an obligation, in consideration of the obligation in respect to which the promise is made, in terms or under circumstances such as to render the party making the promise the principal debtor, and the person in whose behalf it is made his surety.

"The theory embodied in the quoted statute . . . [is] essentially . . . that one who purports to guarantee a debt and does so in such a manner as to make himself the principal debtor, shall be held liable on the debt even though the debt was not guaranteed by a writing." Cargill, 426 F. Supp. at 510.  To prove the applicability of this exception, "the plaintiff is obliged to prove the following: (1) that plaintiff became a creditor by parting with something of value; (2) that the defendant promised to answer for the obligation created; and (3) that the circumstances were such as to render the promisor the principal debtor." Id.

NCC did not present any evidence to satisfy these requirements.  First, NCC did not part with anything of value on June 21, 2004.  NCC did not part with any value until a month later when NCC attempted to tender performance by releasing its claims shortly before the confirmation hearing on July 27, 2004.  By then, NCC knew Hoich denied guaranteeing the alleged settlement.

Second, there is no evidence Hoich agreed to answer for any obligation created between NCC and TSF.  The district court stated, "Hoich had, under oath, previously testified that he himself would make sure that cash would be available to TSF to pay its obligations." American Prairie, 529 F. Supp. 2d at 1077.  This is an inaccurate statement of Hoich's testimony.  Hoich agreed, in the bankruptcy proceeding, to provide funds to TSF for the sole purpose of assisting TSE in making planned

-13-

improvements to TSE's ethanol plant. Hoich then explicitly refused to guarantee payment to any other creditors.

The district court continued, "Without Hoich's participation, no settlement was possible, given the fact that TSF was an entity with no assets and no ability to pay anything." Id. The record suggests TSF did have assets and the ability to pay under the agreement because TSF later raised the $2.5 million for the settlement from investors other than Hoich. Neither the district court nor NCC identify any evidence to support the claim Hoich personally agreed to answer for TSF's obligations.

Finally, because NCC did not part with anything of value on June 21, 2004, and because Hoich did not agree to be liable personally, the circumstances did not render Hoich the principal debtor. The exception to the writing requirement in S.D. Codified Laws § 56-1-6 was not satisfied, and the district court erred in finding Hoich agreed, in writing or otherwise, to be a guarantor.

### 2. Principal Liability

Our next inquiry is whether Hoich was a party to the settlement agreement. In its opinion, the district court declared, "Hoich is liable as a principal in the settlement agreement only if [NCC] can show that Jandrain had ostensible (apparent) authority to bind Hoich on the record." American Prairie, 529 F. Supp. 2d at 1077. The district court concluded,

> Hoich caused and allowed Rudeen to believe that Jandrain had the authority to bind Hoich at the June 21, 2004, hearing. Hoich was himself a principal obligor in the agreement to purchase NCC's claims against the TSE bankruptcy estate by virtue of his acts and the acts of his ostensible or actual agent, Jandrain.

Id.

-14-

We review a district court's findings that a party entered into a settlement agreement for clear error.  See Chaganti & Assocs., P.C. v. Nowotny, 470 F.3d 1215, 1221 (8th Cir. 2006) (citation omitted).  Whether an agency relationship exists is a mixed question of law and fact.

> When the facts relied upon to establish the existence of an agency are undisputed, and conflicting inferences cannot be drawn from them, the question of the existence of an agency is one of law for the court.  On the other hand, when the facts pertaining to the existence of an agency are conflicting, or conflicting inferences may be drawn from the evidence, the question is one of fact for the jury, or for the court as the trier of fact if the case is tried without a jury.

3 Am. Jur. 2d Agency § 352.  South Dakota courts have held, "In the law of agency, a principal will be liable for contracts made in its behalf by an agent if the agent was *authorized* to enter into the agreements."  Federal Land Bank of Omaha v. Sullivan, 430 N.W.2d 700, 701 (S.D. 1988) (citations omitted).  "This authority may be actual or ostensible."  Id.

"Actual authority is created by manifestations from the principal to the agent, [S.D. Codified Laws] § 59-3-2, while ostensible authority is created when the principal allows a third person to believe the agent has authority to act on the principal's behalf [, S.D. Codified Laws] § 59-3-3."  Id.; see also S.D. Codified Laws § 59-1-5 ("Agency is ostensible when by conduct or want of ordinary care the principal causes a third person to believe another, who is not actually appointed, to be his agent.").  In reality, an ostensible agency is not a true agency relationship.  See Federal Land Bank of Omaha, 430 N.W.2d at 701.  Instead, it is "based entirely on an estoppel."  Id. (citations omitted).

> [W]here it appears that the principal knew, or by a proper supervision of the affairs of the agency ought to have known, of the acts of the agent, or the general course and manner in which he was conducting the

-15-

> business of the agency, he is estopped as against innocent third persons from denying the power of the agent to act.

Baldwin v. National College, 537 N.W.2d 14, 18 (S.D. 1995) (quoting Federal Land Bank of Omaha, 430 N.W.2d at 701).

"Ostensible agency for which a principal may be held liable must be traceable to the principal and cannot be established solely by the acts, declarations, or conduct of an agent." Kasselder v. Kapperman, 316 N.W.2d 628, 630 (S.D. 1982) (citation omitted). "Once ostensible agency is determined, the principal is bound by the acts of his agent to only those persons who have 'in good faith, and without negligence, incurred a liability or parted with value upon the faith thereof.'" Dahl v. Sittner, 429 N.W.2d 458, 462 (S.D. 1988) (quoting S.D. Codified Laws § 59-6-3). "The third person dealing with the agent, therefore, must show not only damages resulting from his reliance on the appearance of authority, but also reasonable diligence and prudence in ascertaining the fact of the agency and the nature and extent of the agent's authority." Id. (citation omitted). "When the existence of an agency relationship is denied, the burden of proof is upon the party who affirms its existence." Kasselder, 316 N.W.2d at 630 (citation omitted).

Thus, in order to determine if Jandrain was Hoich's ostensible or apparent agent at the settlement hearing, we must determine whether Hoich engaged in conduct which caused NCC representatives reasonably to believe, "in good faith, and without negligence," Jandrain had authority to bind Hoich. Dahl, 429 N.W.2d at 462. In the days before the hearing on June 21, 2004, Hoich represented TSF in settlement negotiations with NCC representative Rudeen. Hoich was in close contact with other TSF representatives, including Ruback and Jandrain, throughout the negotiations. Hoich spoke to Ruback and Jandrain about what settlement figures Hoich was authorized to offer NCC, and after Hoich conferred with Ruback and Jandrain, they decided Hoich would offer NCC $2.5 million in exchange for NCC's interests in, and

claims against, TSE. On the evening of June 20, 2004, Hoich made the offer to Rudeen. Hoich told Rudeen he would try to raise the money, Hoich was committed to the deal, and $2.5 million was as high as Hoich and the other investors could go. Rudeen testified he did not know who the money would be coming from, and when asked if Hoich had guaranteed the money would be paid, Rudeen responded, "I don't believe so."

The following morning, June 21, 2004, shortly before the hearing commenced, Rudeen called Hoich and accepted the deal. After Rudeen accepted the deal, NCC attorney, Hall, discussed the terms of the agreement with representatives for TSF and Interstate, and summarized the terms on a note pad. Hoich was not present. Hoich did not ask anyone to represent him, Hoich did not notify anyone he would be sending an agent to represent his interests, and no one purported to be present as Hoich's representative.

Once the terms of the settlement supposedly were established, the confirmation hearing commenced and Hall read the terms of the agreement on the record. Hall read the names of the parties involved, and listed Hoich, stating, "who--it's my understanding--has personally committed to this deal." After the remainder of the agreement was read into the record, the bankruptcy court asked a series of questions. The court first asked Strasheim, "Is that your deal?" Strasheim responded, "[T]hat is the deal," and explained his understanding the agreement would be put in writing with a few minor additions, such as "representations and warranties." Strasheim then declared, "But I would finally say I do not represent Mr. Hoych [sic]." Strasheim continued, "I believe that [Hoich] is in this deal but I'm appearing here on behalf of Interestate [sic] Financial."

In response Hall stated, "I know that Mr. Strasheim does not represent John Hoych [sic], but it is again our understanding that Mr. Hoych [sic] personally committed to this deal to the principals of North Central." The court began to ask Hall

-17-

what this belief was based upon, when Hall interrupted stating, "Mr. Jandrain is here to confirm that. Mr. Hoych [sic] for some reason . . . he's not here. But we think we have a deal with John Hoych [sic] as well." With that, Strasheim pointed Jandrain out to the court, and again stated, "I think it's my understanding that Mr. Hoych [sic] has committed to this. I simply do not represent him and I would want to make that clear."

Jandrain was never asked to confirm any representation of Hoich or whether Hoich had agreed to be bound personally under the settlement agreement. Jandrain did not object to the statements made by Strasheim and Hall, and Jandrain later explained his reasons for not objecting were (1) the result of his position in the back of the crowded court room, (2) he did not want to interrupt proceedings, and (3) he was never addressed by the court, or anyone else, to inquire whether he was in fact present to represent Hoich's interests in the matter.

Based upon these facts, we conclude NCC has not met its burden to show Jandrain was at the June 21, 2004 confirmation hearing with actual authority to bind Hoich to the settlement agreement.[4] South Dakota law dictates, "Actual authority is such as a principal intentionally confers upon the agent, or intentionally or by want of ordinary care, allows the agent to believe himself to possess." S.D. Codified Laws § 59-3-2. The record does not demonstrate Hoich gave Jandrain authority to act on Hoich's behalf, nor is there any evidence Jandrain believed he had such authority.

---

[4]NCC has never alleged or argued Jandrain was Hoich's actual agent. NCC did eventually argue Jandrain was Hoich's ostensible agent, but NCC failed to raise this apparent authority claim in its complaint. The complaint alleged Hoich was a party to the oral agreement made on June 21, 2004, because of Strasheim's actions that day "as agent for Hoich." This allegation actually tends to disprove the current contention NCC was led to believe Jandrain was Hoich's agent at the hearing.

-18-

The district court held Jandrain had ostensible or apparent authority to bind Hoich to the settlement agreement, and Jandrain did so when Jandrain failed to object to the settlement terms when the terms were read into the record. Under South Dakota law, the conduct of an agent is insufficient to create an ostensible agency. See Kasselder, 316 N.W.2d at 630. Neither Jandrain's silence in the courtroom, nor the statements made by Hall and Strasheim at the hearing, were sufficient to create an ostensible agency.

There is no evidence in the record Hoich intentionally or negligently engaged in conduct which reasonably led NCC representatives to believe Jandrain was Hoich's ostensible agent. Rudeen admitted Hoich never told Rudeen, either during the negotiation process or on the day of the hearing, that Jandrain would be representing Hoich. At trial when Hoich's counsel inquired of Rudeen, "I asked you [at your deposition], 'well, did you understand Jim Jandrain was representing John Hoich at that hearing?' And your answer was, 'I don't know if I could say that, I understood that or if it was ever specifically stated to me.' Was that your testimony?" Rudeen answered, "Yes."

Even if NCC believed Jandrain was Hoich's agent, NCC did not ascertain whether Jandrain had authority to bind Hoich to a $2.5 million settlement agreement. NCC did not show the required "reasonable diligence and prudence in ascertaining the fact of the agency and the nature and extent of the agent's authority." Dahl, 429 N.W.2d at 462 (citation omitted). The established facts demonstrate: (1) Hoich did not tell NCC that Hoich intended to be personally liable under the agreement, (2) Hoich did not inform NCC that Jandrain was authorized to represent Hoich's interests at the confirmation hearing, (3) Hoich was not present when the terms of the agreement were drafted, (4) Hoich did not have counsel at the hearing when the other parties to the agreement had counsel present, and (5) neither Hoich nor Jandrain made any statements indicating Jandrain was at the hearing on Hoich's behalf. For these reasons, any belief NCC and its representatives possessed that Jandrain was Hoich's

agent was unreasonable.[5]  The district court clearly erred in finding Jandrain was Hoich's ostensible agent and in holding Hoich personally liable for the settlement agreement.

### D.    Judicial Notice

Hoich finally argues the district court erred in taking judicial notice of TSF business records and a book written by Hoich.  During trial, the district court ordered TSF representatives to provide the court with a copy of TSF's "corporate records."  TSF sent its records, which included minutes from an April 23, 2005 TSF meeting.  The minutes noted Jandrain was present at the meeting and had a proxy for twelve different TSF members, including Hoich.  The district court referenced this record in its opinion, stating, "We also know that, based on the business records of TSF, Jandrain was the holder of a proxy given by Hoich as to the interests of Hoich in TSF.  In other words, the proxy specifically authorized Jandrain to act as an agent for Hoich as to TSF affairs."  American Prairie, 529 F. Supp. 2d at 1069.

After trial, the district court conducted independent internet research, located Hoich's book, *From the Ground Up*, and referenced it for the first time in the district court's opinion.  The court took judicial notice of the book and described some of the contents, including "a picture of Jandrain in Hoich's airplane," and its corresponding caption which read, "Jim Jandrain, John's CPA and friend on John's plane in 2005, returning from an ethanol meeting."  Id. at 1068.  The court referenced another picture with the caption, "Jim Jandrain (John's CPA), John L. Hoich, and Doug Pugh (Real Estate Advisor) in front of John's plane (2006)."  Id.  Based on Hoich's book, the

---

[5]Hoich also argues NCC's belief was unreasonable because NCC's counsel knew, or should have known, "that an agent could not make Hoich a party to the oral agreement without a written document signed by Hoich."  Hoich cites a significant amount of South Dakota law mandating certain types of agency agreements be in writing.  We need not address this issue because the evidence does not support a finding of ostensible agency.

court found, "John Hoich is not a babe in the woods. He is a very intelligent and enormously successful business person. . . . He is a friend of more than one President of the United States. He is a friend of Warren Buffet of Omaha, perhaps the most sophisticated business person in the world." Id. at 1078-79. The court used this information to support its finding that Jandrain was Hoich's agent.

We review a district court's decision to take judicial notice for abuse of discretion. See Baker v. Barnhart, 457 F.3d 882, 891 (8th Cir. 2006). Pursuant to Federal Rule of Evidence 201(b), "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." A court may take judicial notice at any stage of the proceeding whether or not the notice is requested by the parties. See Fed. R. Evid. 201(c), (f). "Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998) (citations omitted); see also Holloway v. Lockhart, 813 F.2d 874, 879 (8th Cir. 1987) (citing Fed. R. Evid. 201(b) advisory committee notes).

The court used the minutes of a TSF meeting to support its conclusion that Hoich gave Jandrain a proxy which "authorized Jandrain to act as an agent for Hoich as to TSF affairs." American Prairie, 529 F. Supp. 2d at 1069. The document does not directly state or even imply this. The only conclusion which can be ascertained from the document is Hoich, and eleven other TSF members, gave Jandrain a proxy to vote on their behalf in a single meeting taking place ten months after the alleged agreement was made. The district court also erred in taking judicial notice of statements Hoich made in his book regarding Hoich's success and the friendships Hoich had with Jandrain. These facts are not subject to judicial notice under Fed. R.

Evid. 201(b) or for relevance under Fed. R. Evid. 401 because a friendship and a position as one's CPA do not tend to establish an authorized agency to negotiate a contract.

When taking judicial notice of adjudicative facts, the judge is required to use the procedures set forth in Fed. R. Evid. 201. "One of the requirements of Rule 201 is procedural, namely, that the parties be given notice and an opportunity to object to the taking of judicial notice." United States v. Hoyts Cinemas Corp., 380 F.3d 558, 570 (1st Cir. 2004); see also Fed. R. Evid. 201(e) ("A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken."). While Hoich was present during trial and he knew the court requested TSF business records, Hoich did not have knowledge of the specific TSF documents which would be sent, nor did he know which documents the court would select for taking judicial notice. Thus, Hoich was not provided with advance notice that the court intended to take judicial notice of minutes from a TSF meeting. Hoich was also not provided with notice of the court's intent to take judicial notice of Hoich's book.

Caution must also be taken to avoid admitting evidence, through the use of judicial notice, in contravention of the relevancy, foundation, and hearsay rules. See, e.g., Baker, 457 F.3d at 890-92. Each judicially noticed document included hearsay evidence which is generally only admissible at trial through an enumerated hearsay exception. No such foundation was laid for the TSF business records before the district court took judicial notice of the documents. See, e.g., United States v. Samaniego, 187 F.3d 1222, 1224 (10th Cir. 1999). Further, a proper foundation was not laid for the admission of statements in Hoich's book. See, e.g., Baker, 457 F.3d at 891 (quoting Schneider v. Revici, 817 F.2d 987, 991 (2d Cir. 1987)).

The district court discovered the book when conducting its own independent research. While courts are often required to conduct independent research regarding questions of law, "[o]n fact questions, the court should not use the doctrine of judicial notice to go outside the record unless the facts are matters of common knowledge or are capable of certain verification." Alvary v. United States, 302 F.2d 790, 794 (2d Cir. 1962) (citations omitted) (deciding "[i]t was error for the trial judge to take judicial notice of text books that were not part of the record").

While district courts have broad discretion to take judicial notice of administrative facts, under the limited circumstances of this case, the district court abused its discretion when the court used the judicially noticed evidence to support a finding Jandrain was Hoich's agent and had authority to bind Hoich to a $2.5 million settlement agreement.

## III.  CONCLUSION

We affirm the district court's denial of Hoich's motion for recusal and disqualification. We reverse the district court's judgment that Hoich was a guarantor of, or a party to, the alleged June 21, 2004 settlement agreement, and we hold the district court abused its discretion when it took judicial notice of the April 23, 2005 TSF meeting minutes and portions of Hoich's book. We reserve all other issues pending the bankruptcy stay.

_____

-23-